UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA

V                                    Case No. 22-4342

SAMANTHA ANGELINA JOHNSON

      Appellant

## **THIRD SUPPLEMENTAL  APPENDIX**

Transcript of Hearing Before Judge Xinis on May 19, 2022 ................145-166

Transcript of Hearing Before Judge Xinis on May 25, 2022 ...............167-278

1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
2                     SOUTHERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4            Plaintiff,              )
                                     ) Case Number: 21-mj-1961-GLS
5            vs.                     )
                                     )
6   SAMANTHA JOHNSON,                )
                                     )
7            Defendant.              )

8

          TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
9            BEFORE THE HONORABLE PAULA XINIS
                UNITED STATES DISTRICT JUDGE
10          THURSDAY, MAY 19, 2022; 2:00 P.M.
                   GREENBELT, MARYLAND
11
                   A P P E A R A N C E S
12
    FOR THE PLAINTIFF:
13
        OFFICE OF THE UNITED STATES ATTORNEY
14            BY:  ELLEN E. NAZMY, ESQUIRE
              6406 IVY LANE, SUITE 800
15            GREENBELT, MARYLAND 20770
              (301) 344-4126
16
    FOR THE DEFENDANT:
17
        LAW OFFICES OF KARPEL and LINK
18            BY:  RICHARD JOSEPH LINK, ESQUIRE
              77 SOUTH WASHINGTON STREET, SUITE 307
19            ROCKVILLE, MARYLAND 20850
              (240) 453-9191
20
    ALSO PRESENT: Stacy Carter-Maczyk - Pretrial Services
21
          ***Proceedings Recorded by Mechanical Stenography***
22        Transcript Produced By Computer-Aided Transcription

23  ─────────────────────────────────────────────────

             MARLENE KERR, RPR, RMR, CRR, FCRR
24            FEDERAL OFFICIAL COURT REPORTER
              6500 CHERRYWOOD LANE, STE 200
25            GREENBELT, MARYLAND 20770
                   (301)344-3499

2

```
 1              P R O C E E D I N G S
 2       (Call to Order of the Court.)
 3          THE COURTROOM DEPUTY:  May I have your attention,
 4   please.  The United States District Court for the District of
 5   Maryland is now in session, the Honorable Paula Xinis
 6   presiding.
 7              THE COURT:  All right.  Good afternoon, everyone.
 8       All right.  Would the government call the case.
 9              MS. NAZMY:  Thank you, Your Honor.
10       This is the case of United States v.  Samantha Johnson,
11   21-mj-1961, and we are here for a bail review.
12              THE COURT:  All right.  Put your appearance on the
13   record, please.
14              MS. NAZMY:  Ellen Nazmy for the United States.
15              THE COURT:  Okay.
16              MR. LINK:  And good afternoon.  Richard Link on
17   behalf of Samantha Johnson who is here to my left.
18              THE COURT:  Okay, great.
19       And I see we're joined by Ms. Stacy Carter-Maczyk.  Thank
20   you so much.  Good to see you.
21       Okay.  Mask policy in the court, if you're vaccinated and
22   speaking, feel free to take your mask off if you wish.  You
23   don't have to.  It's completely up to you.  But in any event,
24   just speak clearly into the microphone.
25       We're here, Mr. Link, on your motion for review of the
```

1    detention order that was entered by Judge Simms last Friday.

2            MR. LINK:  Yes, Your Honor.

3            THE COURT:  Let me just let you all know what I've

4    reviewed, and then you can tell me if there is any additional

5    evidence, and I'll hear you from first.  I have reviewed the

6    Pretrial Services report, the docket, the three violation

7    petitions, as well as the hearing trans -- it wasn't the

8    transcript.  I listened to the audio.  So if there is anything

9    else -- as well as the underlying charges.  If there is

10   anything else that you wish for me to consider, as well as your

11   argument, Mr. Link, I'm happy to hear you.

12           MR. LINK:  Yes, Your Honor.  I have an additional --

13   may I approach?

14           THE COURT:  Sure, you may.

15           MR. LINK:  I've shown a copy of this to the

16   government.

17           THE COURT:  You can go ahead and give it to

18   Mr. Ulander and then he'll hand it up to me.

19       (Counsel tenders document.)

20           THE COURT:  Okay.  What am I looking at here?

21           MR. LINK:  Well, as it was referenced in the

22   paperwork, Ms. Johnson is facing charges in D.C. Superior

23   Court.

24           THE COURT:  And, Mr. Link, if you wish, you can sit

25   so that you're closer to the microphone.  You don't need to

4

1   stand.  I'm okay with being seated, if you wish.

2          MR. LINK:  It's just a habit, Your Honor.

3          THE COURT:  Yeah, I get it.  You're also relatively

4   tall.  But it's harder to hear, especially with our masks on.

5   So feel free to sit, and you can go right into the microphone.

6       So tell me what I'm looking at.

7          MR. LINK:  As indicated in the pleadings that you

8   reviewed, Ms. Johnson is facing charges in D.C. Superior Court.

9   She's on pretrial release in that court.  I have conferred with

10  her counsel in that particular case.  She shared with me that

11  she's compliant.  The only non-compliance was the warrant in

12  this case, but her counsel emailed me this Pretrial Services

13  report which, obviously, speaks for itself.  It does have a

14  provision, contact report, on the last page of this document.

15         THE COURT:  Let's make this a court exhibit as well,

16  and it can be under seal because it appears to be a Pretrial

17  Services agency status report, which I don't feel comfortable

18  having on the open record, but I think it would be important to

19  have this as a court exhibit for today's purposes.

20      Let me see what we're doing here.  All right, so the

21  offense, the charge is no permit.  Meaning no permit to drive,

22  I would imagine?

23         MR. LINK:  That's what that refers to in D.C., yes,

24  Your Honor.

25         THE COURT:  Okay.  Leaving after colliding, personal

5

1   injury, possession of prohibited weapon, mace, simple assault.

2       Is this charge also included in the Pretrial Services

3   report?

4           MR. LINK:  It's not a conviction, so the answer is --

5           THE COURT:  Yes, it could be.

6           MR. LINK:  Right, it could be.

7           THE COURT:  There are pending -- you know, charges

8   that are pending and open could and should be in the Pretrial

9   Services report.  So I'm just looking for the -- let's see.  It

10  would not have been because it would be subsequent to the

11  Pretrial Services report, right?  So, in theory, this report

12  would have been created months after Ms. Johnson's initial

13  appearance.  Am I right?

14          MS. NAZMY:  Your Honor, this offense is on the

15  Pretrial Services report on page 13.

16          THE COURT:  Oh, okay.

17          MS. NAZMY:  It occurred on June 15, 2021, just a few

18  days before this offense, but it did precede it.

19          THE COURT:  Okay.  So let me match it up.  I see

20  because the case is ending in 883.  So this report was issued

21  after Ms. Johnson's initial appearance on this case, but the

22  matter was pending when this case came in, in this court.

23          MR. LINK:  Correct.

24          THE COURT:  Okay.  I got it.

25      All right.  What else do you wish for me to know,

6

1    Mr. Link?

2             MR. LINK:  So I have no other actual evidence.  Does

3    Your Honor wish me to go to the podium?

4             THE COURT:  You can stay where you are or the podium.

5    Whatever you're more comfortable with.  Either one.

6             MR. LINK:  Okay.

7             MS. NAZMY:  Your Honor, briefly, may I just note that

8    the government did file a response yesterday.

9             THE COURT:  I didn't get it.

10            MS. NAZMY:  We just wanted to make sure that you

11   received -- may I give you a copy?

12            THE COURT:  Yes, please.  Why don't I get everything

13   read first and then I'll hear from you, Mr. Link.  Thank you

14   for letting me know that.  I had not seen it.

15            MS. NAZMY:  You're very welcome.

16            THE COURT:  Okay.  Give me one minute.

17         (Brief pause.

18            THE COURT:  Okay.  All right.  Thank you, Ms. Nazmy.

19   I appreciate it.

20            MS. NAZMY:  Thank you, Your Honor.

21            THE COURT:  Mr. Link.

22            MR. LINK:  Yes.  So I'll start with what I think is

23   probably something the Court needs to focus on significantly,

24   given the standard of review, and that is whether Ms. Johnson

25   is a flight risk.  I think I include the Pretrial Services

1  report from D.C. because I do think that's significant to show

2  that she has been compliant with her court appearances in D.C.

3       But let me just tell you a little bit of background about

4  what led --

5          THE COURT:  Can I ask you, though, before you do

6  that --

7          MR. LINK:  Yes.

8          THE COURT:  -- since you brought up standard of

9  review?

10      The government, I think, rightly points out that the

11  statute at issue is 18 U.S.C. 3148.  Do you disagree with that?

12          MR. LINK:  Not based upon my review.  No, I don't

13  disagree.

14          THE COURT:  You don't disagree.  Okay.

15          MR. LINK:  I agree.  Is that a better verbiage?

16          THE COURT:  That's an easier way of saying it.

17      So if I make the determination that Ms. Johnson had

18  violated a condition of her release, then I am under 3148.  So

19  if you would sort of train your arguments to be in compliance

20  with that statute, that would be great.

21          MR. LINK:  Right.  So that's why I wanted to focus on

22  whether Ms. Johnson is a flight risk before I go any further.

23      The fact that she's compliant with terms of release in

24  D.C. --

25          THE COURT:  Yep.

1         MR. LINK:  This came out, and you heard this by

2   listening to the prior court hearing before Magistrate Judge

3   Simms, but Ms. Johnson was essentially viewing herself -- was

4   pro se since August or September of 2021.  She had understood,

5   based upon her conversations with counsel and/or the pretrial,

6   that she was to wait to hear from the courts.

7         And I'm just pointing that out because that's sort of the

8   explanation as far as why she did not actually appear or make

9   contact with Pretrial, but it's also significant because

10  Ms. Johnson, as recently as April of 2022, actually came to the

11  court.  And I can point out the document if you want to see it,

12  but in April of 2022, there is a handwritten motion that she

13  filed.

14        THE COURT:  Yes, that motion to quash, I believe.

15        MR. LINK:  Yes.  I think it's documentary number 35.

16  And she was asking -- she was basically -- she understood from

17  her D.C. lawyer that there is this open warrant out of Maryland

18  because of this case, and she filed that motion, and she

19  thought that she was going to -- rightly or wrongly, she

20  thought she was going to see a judge that day to address that

21  issue.

22        So I would like the Court to consider at least giving that

23  some weight, as she was trying to address the warrant, and she

24  was trying not to duck from appearing in this particular case.

25        She also understood, when she appeared in D.C. Superior

9

1  Court on May 4, 2022, for a status conference that it was

2  likely that she could be detained based upon the report that

3  said there was an open warrant.  So but knowing full well that

4  that was going to happen, she went to court.  She did not duck

5  going to court.  And, of course, she was detained and brought

6  by the marshals over to this court, and she's been held since

7  that time.

8        THE COURT:  So, Mr. Link, assume, just for the sake

9  of argument, that I credit your argument, how about 18 U.S.C.

10  3148(1)(b) -- (b)(1)(B)?  If I find that Ms. Johnson violated

11  one of her pretrial conditions, and I find that she's unlikely

12  to abide by any condition or combination of conditions of

13  release, that's an independent basis to detain her, correct?

14        MR. LINK:  It would be but I would -- I wanted to

15  start with the flight risk issue.

16        THE COURT:  But I guess the reason why that one,

17  though, I think is -- I mean, you're a good lawyer.  You start

18  with the argument that I think benefits you, but this one is a

19  tough one for me.  It's based on the three violation reports in

20  a very short period of time where Ms. Johnson -- she can put it

21  on Ms. Corcoran, put it on whatever, the bottom line is

22  pretrial recommended detention.

23        There was ample authority for the judge to exercise his

24  discretion in that regard.  He didn't.  He gave Ms. Johnson a

25  chance with some very stringent release conditions, and many of

1  the most important, in my view, weren't followed at all.  So

2  that's -- you know, whether there is a factual response -- and

3  I've heard the hearing, but, you know -- you all discussed

4  this, but I'm not seeing a whole lot in the record that

5  suggests the three violation reports, which chronicle just a,

6  you know, persistent inability or lack of -- I don't know what

7  it is, but there was just no compliance.  There was just -- it

8  was just very, very difficult for pretrial to get any

9  compliance out of Ms. Johnson.

10      We can go through it, but that's what I really want to

11  talk about, because I'm not sure how I can reverse Judge Simms'

12  decision on that record.

13      MR. LINK:  So I guess my -- I did file a supplement

14  saying that the box -- and I'm sure Your Honor saw it -- that

15  the box was not checked for electronic monitoring.  So

16  Ms. Johnson was sort of maybe not fully understanding that that

17  was a condition of release.

18      THE COURT:  How can that be?  She was on 24-hour

19  lockdown, and it had to be monitored somehow, and the somehow

20  does not need to be part of the report.  In other words, these

21  were pandemic measures being taken for the benefit of folks on

22  pretrial supervised -- pretrial release so that they could

23  comply safely.

24      It's my understanding that this was a phone check.  Is

25  that right?

1    MS. CARTER MACZYK:  Yes, Your Honor.

2    THE COURT:  Yes.  The person had to have a cell phone

3    with a GPS device and be willing to show your face and report

4    so that it can be determined that the person is where he or she

5    is supposed to be.  So how is that at all not clear to

6    Ms. Johnson such that I should forgive the -- you know, there

7    were days in which Ms. Johnson missed all of them, right, three

8    or four; turning off her phone, turning off the GPS, blocking

9    out her photo so that the independent service that, you know,

10   provided this monitoring service couldn't verify it was her.

11   How is that --

12   MR. LINK:  I would say there were, obviously, days

13   where there was not compliance.  We have to concede that, if

14   you credit the report.

15   THE COURT:  Yes.

16   MR. LINK:  But there are days, I mean, reporting

17   late, but I don't want to go through every one of them unless

18   you want to hear from me doing that, but there were days where

19   she was reporting or reporting late or maybe reporting from a

20   different location, but she was reporting.

21   THE COURT:  Well, in fairness, I want -- you can

22   address it any way you want, but Ms. Johnson was released on

23   the 22nd.  Trouble started on the 23rd.  The officer couldn't

24   get in the house.  The 24th, missed biometric check; 26th,

25   26th; 28th, there was a violation report chronicling up to that

1    point; 29th, another missed one; 30th, location services --

2    31st, rather, turned off with a blacked out photo issue.

3         And then there is the second violation report on the 2nd.

4    August 3rd, we have issues with same; the 5th, the 6th, the

5    7th, the 8th, if I'm seeing it right.

6         And then, finally, the violation -- the third violation

7    report, which triggers the warrant, is the 9th.  So there is

8    more non-compliance than compliance.

9              MR. LINK:  Your Honor, I would just say, after

10   looking at the last report for August 3rd, she complied but

11   complied late.

12             THE COURT:  Yep.

13             MR. LINK:  Missed on the 5th.  August 6th, complied

14   late.  Nonetheless ,I would say there are instances of

15   compliance if you go through the report.

16             THE COURT:  Yeah, but the problem is that when you're

17   on 24-hour lockdown and pretrial has one way -- because now

18   Ms. Bostick wasn't letting Pretrial in.  So there wasn't even a

19   third-party custodian who, arguably, was cooperative.  Couldn't

20   get in the house to verify the residence, to verify the

21   suitability of it.  So we've got that problem.  That's strike

22   one.

23        Then Ms. Bostick is not communicating, right?  There is no

24   communication between Ms. Bostick and Pretrial at this point.

25   And the communication between Ms. Johnson and Pretrial, while

13

1    there is a difference of opinion as to the tone and the quality

2    of it, it wasn't sufficient to monitor Ms. Johnson because she

3    wasn't -- she also was not complying with the location

4    monitoring requirements.

5         MR. LINK:  Ms. Johnson did share with me, and this

6    was not on the record last time, but she had issues with her

7    phone that partially explained it.

8         I did speak to Ms. Bostick, Your Honor --

9         THE COURT:  There is no evidence of issues with the

10   phone.  None.  I have nothing in front of me.  What I do have

11   is a violation, three violation reports demonstrating that that

12   phone went off when Ms. Johnson wanted it off and back on when

13   she wanted it on.  She had the ability to text Pretrial to say

14   "okay" when Pretrial would say "turn your phone on.  Turn the

15   locations on."  She could communicate, and I heard this at the

16   hearing last time, communicate with Ms. Corcoran about how

17   Ms. Corcoran got it wrong.  The phone worked then.  So I don't

18   buy it.

19        Really, like, if there is credible evidence, give it to

20   me; otherwise, this record is what it is.

21        MR. LINK:  All right.  I'm just sharing with you --

22   in terms of Ms. Bostic, Your Honor --

23        THE COURT:  Sure.

24        MR. LINK:  I understand she's a third-party custodian

25   and that's being used against Ms. Johnson in this particular --

1    THE COURT:  It's only being used against her to the

2  extent that I don't have any other -- she wasn't a suitable

3  third-party custodian.  That's clear.  There are no other

4  suitable third-party custodians.  And even the report you

5  handed up states that that agency could not verify or doesn't

6  have Ms. Johnson's verified address.  On page 2, it says

7  address verification.  Ms. Johnson has not verified her

8  address.  PSA mailed an address verification letter to her on

9  12-28-21.  So that's their agency's protocol.

10    But that is not sufficient, in my view, when I don't have

11  a third-party custodian.  I don't have a verified address, and

12  I have the violations that have been laid out.  So that's the

13  only way in which it's being used against Ms. Johnson.  I don't

14  have anybody here that's an alternative.  Right?

15    MR. LINK:  I understand.  I just wanted to say that

16  there was an issue with Ms. Bostick having her home searched

17  and that's how that --

18    THE COURT:  I don't understand what you mean by that.

19    MR. LINK:  Well, Ms. Bostick, did -- the Pretrial

20  officer wanted to look throughout the house in order to make

21  sure it was suitable for Ms. Johnson, and, apparently, she was

22  objecting to the entire house being searched.  That is what it

23  is, but I'm just saying there was some issue with --

24  Ms. Bostick was unclear how long Ms. Johnson was going to be --

25  Ms. Bostick was unclear how long Ms. Johnson was going to stay

1  with her.

2          THE COURT:  Right.

3          MR. LINK:  And, of course, courts were slow moving,

4  and maybe you're still slow moving, during the pandemic.  And

5  so but -- so I'm saying there was that issue of noncompliance,

6  but I'm trying to explain it and say that even with all that,

7  she is not a flight risk.  I haven't heard, for example, them

8  saying that there's any new charges or any new driving

9  violations.

10          THE COURT:  But there's ten -- I mean, there's -- I

11 counted ten prior convictions in the Pretrial Services report

12 and with Pretrial recommending detention because there were

13 other factors.  So that's -- I mean, we don't -- we can't just

14 forget about those when we're talking about flight risk, right.

15 So we can go through it if you wish, but there were significant

16 concerns that were raised in the initial appearance where

17 Pretrial was recommending detention.

18      Unverified address.  Recent absconding from supervision.

19 History of failure to appear.  Unrelated matters in state

20 court.  Risk of danger, there were six items.  And that's why

21 Judge DiGirolamo fashioned release conditions that were among

22 the most stringent that we use in this court.

23      And it's hard for me to understand how, if Ms. Johnson did

24 not comply with those conditions such that three violation

25 reports were issued, what evidence do I have that she would

1  comply now?

2      MR. LINK:  Court's indulgence.

3      THE COURT:  Sure, go ahead, yep.

4    (Brief pause.)

5      MR. LINK:  Your Honor, Ms. Johnson indicates that she

6  would like to address the Court about some of her concerns.

7  Are you okay --

8      THE COURT:  Sure.  Listen, I'm fine with

9  Ms. Johnson -- Ms. Johnson, let me just explain a couple of

10  things.  You are a criminal -- you are accused of a crime.  You

11  are presumed innocent.  You have an absolute right to remain

12  silent.  You have an attorney here to protect you in that

13  regard.  If you wish to give up your right to remain silent and

14  tell me anything you want, you're going to be given that

15  opportunity, but, you know, that's something that -- that's why

16  you have a lawyer, to be able to talk with your lawyer about.

17      I'm not at all convinced -- what I will say to you is you

18  do have a hearing coming up.  It's June 15th.  It's marked as a

19  status, but I did confirm with Judge Simms that at that date,

20  she would be willing to try the case, resolve the case short of

21  trial, hear from you on a status.  So your speedy trial rights

22  are fully intact in that regard.

23      You want your trial on June 15th.  Judge Simms will make

24  that happen.  You all, as counsel, need to get together and

25  figure out what you're doing on the 15th, but I want you to be

```
 1  clear on that, Ms. Johnson.  This is not forever.  It's until
 2  you get your case in this court resolved.
 3      Now, with that advisement, Mr. Link, do you want a minute
 4  to talk with your client, make sure that Ms. Johnson wants to
 5  directly address the Court on these issues?
 6          MR. LINK:  Yeah, I think that would be at least --
 7          THE COURT:  Sure.  Absolutely.  You're more than
 8  welcome to.  And you tell me after you've had an opportunity to
 9  talk to her.
10      (Brief pause.)
11          MR. LINK:  So Ms. Johnson indicates that she would
12  like to speak to the Court, Your Honor.
13          THE COURT:  Okay, sure.
14      What would you like me to know, Ms. Johnson?
15          THE DEFENDANT:  Your Honor, I've been clear with
16  Mr. Links that I would like to proceed forward representing
17  myself, that I no longer wish for his representation.  While
18  I'm sure that he is a very well-endowed attorney, I am not
19  comfortable --
20          THE COURT:  Well, we're not going to do that right
21  now.  Here's why.  Here's why.  You, one, should have that
22  proceeding without the government present.  Okay?  You do not
23  have to tell me why you wish to represent yourself in front of
24  the government.
25          THE DEFENDANT:  Okay.
```

1          THE COURT:   That's one.

2      And two, there is a special hearing that I have to conduct

3  that's called -- or Judge Simms, really, because she's the

4  presiding judge on this case.   I'm here as a reviewing court to

5  Judge Simms' detention order.   So the -- technically, if you

6  want what's called a "Faretta hearing," all right, she's the

7  presiding judge over the case.

8      And I would have to give a second -- I've got to give it a

9  second thought as to whether I'm outside my lane.   See, right

10  now you're in front of me as a reviewing court, and my eyes on

11  this are very narrow.   So if you tell me, Ms. Johnson, what you

12  would rather is get square whether you're going to represent

13  yourself, then what I suggest I do is take a recess, talk to

14  Judge Simms, and figure out when, if it's today or shortly

15  after, you can have what's called a "Faretta Hearing."

16      That hearing is required because you have a constitutional

17  right to counsel.   You also have a constitutional right to

18  waive that counsel.   However, the judge has to ask you, the

19  presiding judge, Judge Sims, has to go through a number of

20  questions with you to make sure that's what you want to do.

21  And we're willing to do that.

22      So if that's where you want to go, and that's okay, we can

23  take a short recess.   I'll call her chambers, because I think

24  if that's what you want to do, you do that first, right, and

25  then if you wish to pursue this motion in front of me, the

1  review, then you come back to me either with or without

2  Mr. Link.

3       Does that make sense to you?

4            THE DEFENDANT:  I understand what you've said, ma'am.

5  I would prefer that my case remain before an associate judge

6  and not to go back to a magistrate judge, which is what I was

7  under the impression was represented on my behalf.

8            THE COURT:  Well, you might be able to do that -- are

9  these Class A or Class B misdemeanors?

10           MS. NAZMY:  There is one Class A misdemeanor and two

11 Class B misdemeanors.

12           THE COURT:  Okay.  So there is a process by which you

13 could elect to have your case tried before a district judge.

14 I'm right about that, correct, because it's a Class A

15 misdemeanor?

16           MR. LINK:  Correct.

17           THE COURT:  You have a right to a jury trial on a

18 Class A misdemeanor.

19           MS. NAZMY:  Your Honor -- yes.  Yes, Your Honor.

20           MR. LINK:  Magistrate Judge Simms set it for the

21 15th, in part, to try to make sure the election was made before

22 --

23           THE COURT:  I see.  So you'll have your election on

24 that day.

25      And, I guess, Ms. Johnson, you can, perhaps, elect sooner,

1  but if you're expressing to me now that you wish to represent
2  yourself, the case isn't before me yet or before what we call a
3  "district judge."  So these misdemeanor cases start with a
4  magistrate judge.  That's Judge Simms, and she has authority,
5  under the statute, to try those cases.
6      However, if you have a misdemeanor case that you have a
7  right to a jury trial, you can also ask instead for a district
8  judge to hear it.  I can't make that decision right now because
9  you're also expressing that you want to represent yourself, and
10 that has to come first, and I can't make that decision.  Judge
11 Simms has to.  That's how I'm seeing it right now.
12     So what I would like for us to do is give you a moment to
13 think about this.  I'm going to go talk to Judge Simms'
14 chambers and give you some guidance as to when you might have
15 that hearing on your representation and then we can come back
16 and figure out next steps.  Okay?
17         THE DEFENDANT:  I just want to be clear before you
18 go.  Are we putting -- or just postponing this review, my
19 detention review?
20         THE COURT:  Well, we are --
21         THE DEFENDANT:  Okay.
22         THE COURT:  -- because if -- right.  I'm not going to
23 make any decisions --
24         THE DEFENDANT:  Okay.
25         THE COURT:  -- because I don't want to go forward

1  unless you are square about your rights with regard to your

2  having a lawyer or not having a lawyer.

3              THE DEFENDANT:  Okay.

4              THE COURT:  Yeah.

5      Okay.  So let me take a brief recess.  If you all would

6  sit tight, I'll be back.

7              MR. LINK:  Thank you, Your Honor.

8              THE COURT:  All right, thanks.

9              THE COURTROOM DEPUTY:  This Honorable Court now

10 stands in recess.

11             (Recess taken, 2:35 P.M. - 2:48 P.M.)

12             THE COURTROOM DEPUTY:  This Honorable Court now

13 resumes in session.

14             THE COURT:  All right, everybody.  I had the

15 opportunity to speak with Judge Simms, and she can be available

16 -- we both can be available sort of on the same day to do this

17 seriatim.  So it will be Monday, May 23rd, at noon for

18 Ms. Johnson's Attorney Inquiry Hearing/Faretta Hearing.

19     If the government would do the come-up for Ms. Johnson so

20 we know you're here, and you can have the hearing.  And then

21 whether you proceed on your own, or with Mr. Link's help, your

22 review of this detention order hearing would be at 2:00 on the

23 same day.  So we're going to do them one after the other.

24             MR. LINK:  Did you say Monday or Tuesday?  Because I

25 thought you said Monday.

1              THE COURT:  I meant to say Monday.

2              MR. LINK:  Okay, thank you.

3              THE COURT:  Let me make sure I have the date right.

4    Monday, May 23rd.

5              MR. LINK:  Okay, thank you.

6              MS. NAZMY:  I heard Monday, Your Honor.

7              THE COURT:  What's that?

8              MS. NAZMY:  I heard Monday, Your Honor.

9              THE COURT:  Okay.  May 23, noon, in front of Judge

10   Sims; 2:00 in front of me.  And if the government would make

11   sure Ms. Johnson has the come-up, that would be great.  Okay?

12   And I'll see you all on --

13             MR. LINK:  Monday.

14             THE COURT:  -- Monday at 2:00.  All right.  Thank you

15   so much.

16             MR. LINK:  Thank you.

17             THE COURTROOM DEPUTY:  This Honorable Court now

18   stands adjourned.

19        (The proceedings were adjourned at 2:49 P.M.)

20        I, Marlene Kerr, FCRR, RPR, CRR, RMR, certify that the

21   foregoing is a correct transcript of the stenographic record of

22   proceedings in the above-entitled matter.

23                        Dated this 4th day of July, 2022.

24

25                              /s/
                              _____
                              Marlene Kerr
                              Federal Official Court Reporter

1

| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF MARYLAND |
| 2 | SOUTHERN DIVISION |

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

 3
    UNITED STATES OF AMERICA,        )
 4                                   )
             Plaintiff,              )
 5                                   )  Case Number: 8:21-mj-1961-GLS
             vs.                     )
 6                                   )
    SAMANTHA ANGELINA JOHNSON,       )
 7                                   )
             Defendant.              )
 8

 9        TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
             BEFORE THE HONORABLE PAULA XINIS
10               UNITED STATES DISTRICT JUDGE
            WEDNESDAY, MAY 25, 2022; 11:30 A.M.
11                   GREENBELT, MARYLAND

12                  A P P E A R A N C E S

13   FOR THE PLAINTIFF:

14       OFFICE OF THE UNITED STATES ATTORNEY
             BY:  HOLLIS RAPHAEL WEISMAN, ESQUIRE
15           6500 CHERRYWOOD LANE, SUITE 200
             GREENBELT, MARYLAND 20770
16           (301) 344-4029

17           BY:  ELLEN E. NAZMY, ESQUIRE
             6406 IVY LANE, SUITE 800
18           GREENBELT, MARYLAND 20770
             (301) 344-4126
19
    ALSO PRESENT: Erik Finneyfrock - U.S. Pretrial Services
20
          ***Proceedings Recorded by Mechanical Stenography***
21         Transcript Produced By Computer-Aided Transcription

22
                MARLENE KERR, RPR, RMR, CRR, FCRR
23              FEDERAL OFFICIAL COURT REPORTER
                6500 CHERRYWOOD LANE, STE 200
24               GREENBELT, MARYLAND 20770
                     (301)344-3499
25
```

2

```
1                    A P P E A R A N C E S
                          (continued)
2
    FOR THE DEFENDANT:
3
           SAMANTHA ANGELINA JOHNSON
4               BY:  SAMANTHA ANGELINA JOHNSON - PRO SE
                3622 OLD SILVER HILL ROAD, 903
5               SUITLAND, MARYLAND 20746

6
           LAW OFFICES OF KARPEL and LINK
7               BY:  RICHARD JOSEPH LINK, ESQUIRE - Standby Counsel
                77 S. WASHINGTON STREET, SUITE 307
8               ROCKVILLE, MARYLAND 20850
                (240) 453-9191
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX

JULY 5, 2022

UNITED STATES OF AMERICA vs. SAMANTHA JOHNSON

                                                                PAGE

COMMENCEMENT OF PROCEEDINGS............................... 4


WITNESSES FOR THE GOVERNMENT:

ERIK FINNEYFROCK
        Sworn.............................................. 77
        Direct Examination by Ms. Nazmy.................... 77
        Cross-Examination by Mr. Link...................... 86
        Redirect Examination by Nazmy...................... 92
        Witness Excused.................................... 92

COURT'S RULING............................................ 105

PROCEEDINGS ADJOURNED..................................... 112

CERTIFICATE PAGE.......................................... 112

4

```
 1              P R O C E E D I N G S
 2        (Call to Order of the Court.)
 3              THE COURTROOM DEPUTY:  May I have your attention,
 4    please.  This Honorable Court resumes in session, the Honorable
 5    Paula Xinis presiding.
 6              THE COURT:  Good morning, everybody.  Would the
 7    government call the case.
 8              MS. NAZMY:  Good morning, Your Honor.  This is the
 9    case of United States v. Samantha Johnson.
10              THE COURT:  I'm sorry.  I can't hear you, Ms. Nazmy.
11    Would you go right into the microphone.  Thanks.
12              MS. NAZMY:  My apologies, Your Honor.
13         This is the case of United States v. Samantha Johnson,
14    21-mj-1916, and we're here for a review of the detention order.
15              THE COURT:  Okay, great.  Thank you, Ms. Nazmy.  And
16    will you --
17              MS. NAZMY:  For the record, Your Honor, Ellen Nazmy
18    for the United States, and Hollis Weisman is with me at counsel
19    table.
20              THE COURT:  Okay, great.
21         Okay, Ms. Johnson, would you put your appearance on the
22    record.
23              THE DEFENDANT:  Good morning, Your Honor.  My name is
24    Samantha Johnson, and I'm the defendant.
25              THE COURT:  Okay.  And I understand you're
```

5

1   representing yourself, and Mr. Link is your standby counsel; is
2   that correct?
3           THE DEFENDANT:  Yes.  And I just wanted to quickly
4   see -- I just gained access to my cell phone, with the
5   assistance of Mr. Link, and I'm not sure if we're running late,
6   but I just wanted to see if I could just have a brief three
7   minutes to quickly look at my phone.
8           THE COURT:  Yes.
9           THE DEFENDANT:  And I guess I'll come back to the
10  mic.
11          THE COURT:  Yep.
12          THE DEFENDANT:  Okay.
13          THE COURT:  You just let me know whenever you're
14  ready.
15      Mr. Link, if you just want to put your appearance on the
16  record as standby counsel.
17          MR. LINK:  Yes.  Good afternoon, or good morning.
18  Richard Link, standby counsel for Samantha Johnson.
19          THE COURT:  Okay.
20      All right.  And, Deputies, are you concerned in any way.
21  You're standing.  I'm not sure --
22          THE DEPUTY MARSHAL:  Because cell phones are
23  considered contraband --
24          THE COURT:  Okay.
25          THE DEPUTY MARSHAL:  -- in our instance, we don't

6

1  want to allow her to communicate with someone else.

2          THE COURT:  I see.  All right.  Okay, so you're just

3  confirming that there is no communication.

4      And, Mr. Link, you're there to do the same.

5          MR. LINK:  Yes.

6          THE COURT:  All right.

7      Okay.  No communication, Ms. Johnson, using the phone.

8  You can look at it with Mr. Link's help.

9          THE DEFENDANT:  Your Honor, I'm ready.

10         THE COURT:  Okay.  All right.

11     Okay.  Ms. Johnson, this is your motion at ECF 38 to

12 review Judge Simms' order of detention.  My understanding is

13 Judge Simms has also made available to you the relevant

14 statute, which is 18 U.S.C. 3148, because it's my understanding

15 that Judge Simms found that you had violated your conditions of

16 release based on the three violation reports issued by

17 pretrial, and that there is no, essentially, no assurance that

18 you would follow pretrial release conditions.

19     Since the last time we saw one another, pretrial has

20 supplemented the report, the Pretrial Services Report, which is

21 a document I do review and consider.  Have you received that

22 addendum to the Pretrial Services Report?

23         THE DEFENDANT:  I have the report.  I just didn't

24 quite get an opportunity to fully look at it.  I was just more

25 so prepared to address --

1          THE COURT:  Well, the report -- there is an addendum,

2    and let me summarize it for you.  There is supplemental

3    information, in addition to the report you've already seen back

4    when you were first put on release, as well as the three

5    violation reports, that have been the subject of many hearings.

6    So I'm not going to give you more time to look at those.  You

7    know them.

8          The supplement, however, says that there is a new -- there

9    is a charge that was not included in the original pretrial

10   report.  It was a charge in this court.  It was a misdemeanor

11   charge.  Citations were issued for failure to comply with the

12   directive of a police officer.  The case number is

13   18-po-2881-adc-1.  On 5-30-2018, citations were issued; and

14   then on 6-25-2018, according to court records, there was a

15   failure to appear and a summons issued.

16         And then there was -- there was a summons to appear on

17   August 14, 2018.  The report here says it appears no hearing

18   took place.  I'm not quite sure what that means, but someone

19   will fill me in.

20         There is also additional information regarding the case in

21   Prince George's County, which was a charge date of 8-14-2020,

22   it appears -- well, that's the date that's here, but it says

23   you were released on bond on 5-14-2020 on that case, and then

24   that case was placed on the STAT docket 10-25-21.  So that case

25   resolved without any adverse finding to you.

8

1    Then there was 7-6-2021, the D.C. case that I believe you
2    referenced through Mr. Link last time, the simple assault case.
3    On 7-6-2021, you were released on your personal recognizance,
4    and you have a trial date scheduled 7-12-2022.  That's the
5    addendum, the additional information that's part of the
6    addendum, and that simply goes with the original Pretrial
7    Services Report that was issued back in 2021, when you had --
8    July 20, '21, when you had your initial in this case.
9            THE DEFENDANT:  Okay.  So it sounds like what you're
10   saying is that the addendum is just the three pages, right?
11           THE COURT:  Correct.
12           THE DEFENDANT:  Okay.
13           THE COURT:  So it just goes -- so you have the
14   pretrial report.  You have the three violation reports, and now
15   the addendum of the new information.  Okay?
16       All right.  So, Ms. Johnson, I'll hear from you.
17           THE DEFENDANT:  Okay.  So if I just understand
18   everything correctly, we're starting from where we left off on
19   the 19th?
20           THE COURT:  Well, why don't we start over.
21           THE DEFENDANT:  Okay.
22           THE COURT:  So you're -- this is before me on appeal.
23           THE DEFENDANT:  Okay.
24           THE COURT:  It's what's called a "de novo review,"
25   which is I look anew at everything.

9

1        THE DEFENDANT:  Okay.

2        THE COURT:  And I consider whether, based on the

3   evidence that's in the pretrial reports and the arguments -- as

4   well as what's given to me in the pleadings and the arguments,

5   whether Judge Simms got it right.

6        THE DEFENDANT:  Okay.

7        THE COURT:  And so with that, I'll hear from you.

8        THE DEFENDANT:  Okay.  So as I started off saying

9   downstairs, and I just want to say this before your court as

10  well, Your Honor, everything that I intend on speaking about is

11  humble and as respectful as possible, and that, for the most

12  part, I am just simply trying to defend myself against the

13  allegations.

14       So there was a motion filed on my behalf by my counsel,

15  and I'm not really certain if there was any evidence that was

16  actually submitted.  So my defense is more so focused on the

17  supplemental motion, and I need to just -- is it okay if I take

18  my mask down?

19       THE COURT:  You can, absolutely.  I'm so sorry.  I

20  didn't mention it.  For anyone in the courtroom who is

21  vaccinated and speaking, you may take off your mask while

22  you're speaking.  You don't have to.  But, Ms. Johnson, I take

23  it that you are vaccinated.  You're speaking.  So you can

24  absolutely take your mask off.

25       THE DEFENDANT:  Okay.  So based upon what was filed

1  on my behalf, I just want -- I'm not sure if it's a

2  requirement, because I'm not really aware of procedural law.

3          THE COURT:  That's okay.

4          THE DEFENDANT:  But there is an error in my

5  supplement, and the error falls in on number four when it

6  speaks about the pretrial release conditions as a whole.

7          THE COURT:  Okay.  So let me stop you just so I know

8  what you're looking at.

9          THE DEFENDANT:  Okay.

10          THE COURT:  Are you looking at the motion that

11  Mr. Link filed?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Is it at -- and, Mr. Link, maybe you can

14  help me with that.  Is that ECF 48?

15          MR. LINK:  47, Your Honor.

16          THE DEFENDANT:  47.

17          THE COURT:  Okay, so the supplemental.

18          THE DEFENDANT:  Yep.

19          THE COURT:  Hold on one second.  Let me pull that up.

20  Why do I not have that?  Give me one minute.  I'm just going to

21  pull up the docket.

22      (Brief pause.)

23          THE COURT:  Okay.  So I'm looking at 47.  I'm

24  there --

25          THE DEFENDANT:  Okay.

1    THE COURT:  -- in the main document.  You want me to
2  look at number four?
3    THE DEFENDANT:  Yeah, because this -- I just want it
4  to be clear to the Court.  Like I said, I'm not really sure if
5  it's a requirement.  I wasn't the one who submitted the
6  document.  It was sort of, kind of, submitted on my behalf with
7  limited time, and so I do kind of have issues with it being on
8  the record and in error.
9    And so I'd just like to be clear that I need to -- I'd
10  like to submit, which is my only copy, I'd like to actually
11  submit the pretrial report record.  I want to submit this into
12  evidence as my Exhibit A.
13    THE COURT:  Okay.  And this is?
14    THE DEFENDANT:  This is my order setting conditions
15  of release.
16    THE COURT:  So this is -- I think I already have a
17  copy of it, but I want to make sure, and I'll look at yours.
18    THE DEFENDANT:  Okay.
19    THE COURT:  Is this the Pretrial Services agency for
20  the District of Columbia?  Is that the one that you -- no?
21  That's something different?
22    THE DEFENDANT:  No, this is the United States
23  District Court.  So I had a hearing before Judge Di Giralomo on
24  Zoom, and we set an order of conditions of release.
25    THE COURT:  Okay.

1          THE DEFENDANT:  And this is actually my only copy due
2    to my circumstances.
3          THE COURT:  That's okay.  I'm not going to take it
4    from you.
5          THE DEFENDANT:  Okay.
6          THE COURT:  What I'm going to do is I'm going to pull
7    up the one that I have because I believe it is ECF 13.  Is that
8    right, Mr. Link?
9          MR. LINK:  The copy I'm looking at doesn't have a
10   number on the top.  So I apologize.
11         THE COURT:  All right.  Well, let's make sure it's
12   the same date.  It was signed 7-23-21?
13         THE DEFENDANT:  Yes.  It was signed by the
14   third-party custodian.
15         THE COURT:  Ms. Bostick.
16         THE DEFENDANT:  Yes.  On the back --
17         THE COURT:  If you want, for a moment, just hand it
18   up to me.  I'll compare it to what's on the docket, and once
19   I'm assured that you and I, we're looking at the same document,
20   I'll give it back to you.
21         THE DEFENDANT:  Okay.
22         THE COURT:  And then the record will be clear as to
23   what document we're referring to.
24       (Defendant tenders document.)
25         THE COURT:  Yes, this is the same document.  So ECF

1    13 is a four-page document, and it is identical to what you've

2    handed up.  There is only one notation on the top of yours,

3    which simply says "Thursday," and there might be some notes on

4    the back that I'm not going to look at because they are not --

5    what you're just asking me to consider is ECF 13, and that's

6    the original order --

7              THE DEFENDANT:  Yes.

8              THE COURT:  -- settings conditions of release.  Okay,

9    I'm there.

10             THE DEFENDANT:  So I provided you the entire page 1

11   of 4 simply because, again, I'm just going --

12             THE COURT:  Yeah, yeah.

13             THE DEFENDANT:  So my first Exhibit A is the second

14   page of the pretrial order setting conditions of release,

15   specifically the second page.

16             THE COURT:  Okay.  I'm at the second page.

17             THE DEFENDANT:  And the clerical error in my

18   supplement, and I'm wanting to have it corrected here before

19   the Court, is that it's not paragraph 7 that we are to be

20   focusing on.  It's, specifically, paragraph 8, or Section 8,

21   and it's T, Section T --

22             THE COURT:  Okay.

23             THE DEFENDANT:  -- where it speaks about -- you know,

24   it goes through a list of my conditions of release.

25             THE COURT:  Okay.

14

1          THE DEFENDANT:  And, specifically, relating to

2   location monitoring, technology, and complying with its

3   requirements, it goes through one, two, three, four, which

4   include location monitoring technology, voice recognition,

5   virtual monitoring, radiofrequency, or GPS.  I'm wanting to

6   point out to the Court that that was never selected.

7          So I just -- I kind of have a lot of things that I want to

8   speak about, but I just wrote something where I just basically

9   was saying that while I do understand the views of the Court --

10  because I believe that this was brung up on the 19th -- as it

11  relates to verification of the 24-hour home confinement, with

12  respect to the opinion that biometrics was or is a very defined

13  or suitable method of having being able to verify the

14  conditions, you know, me being home for 24 hours; however, the

15  order setting conditions of release were clear and were set

16  within their respected manner; therefore, you know, I put, as

17  noted, number four, with the correction of the error there.

18         The government should not be permitted to rely upon

19  evidence of any solely outlining alleged violations of

20  biometrics check-in, specifically quoting rules and

21  understandings of the release conditions.  The order does not

22  provide proper notice, if that is factual, you know, about

23  their requirement to provide proper notice to the defendant.

24  Nor does it state or has it ever stated, for that matter, that

25  the defendant was ordered or somehow legally required to submit

1  to location monitoring of any sort for purposes of verifying

2  her whereabouts -- I wrote this kind of in third-party, but I'm

3  speaking about myself -- verifying her whereabouts, verifying

4  other sections of the release conditions.

5      Nor does it make any sort of specification or addendum

6  that state or specify that to somehow satisfy paragraph and/or

7  number eight, Section B of the release conditions, that the

8  defendant was legally required to have had -- to have provided

9  that -- you know, to have -- provided that verification through

10 location monitoring.

11     And that was -- I also put here, in fact, I argue and

12 find, in fact, that the defendant did satisfy the requirements

13 of her release.  Specifically, as it relates to Section A,

14 paragraph 8, Section B, the defendant -- because Section B just

15 simply says to report on a regular basis to the supervising

16 officer.  The defendant shall promptly obey all reasonable

17 directions and instructions of the supervising officer.

18     And so I typed up my own declaration because I think I

19 probably should have said this prior to speaking, but I'd like

20 to be sworn in because I have testimony that I would like to

21 give, and I have a declaration of truth that I'd like to submit

22 into evidence.

23         THE COURT:  And that's fine, Ms. Johnson, but because

24 you're representing yourself, and I'm sure Mr. Link has warned

25 you of this, you know, you do have a constitutional right to

1  remain silent. You do not have to give a declaration. You do

2  not have to give sworn testimony, not even with regard to these

3  allegations, because, frankly, allegations like this could

4  subject a person to separate prosecution -- it says it right in

5  the rule -- for contempt.

6      You also, whenever a person testifies under oath to a

7  court, material omissions or commissions, lies, can be the

8  subject of a separate perjury prosecution. That's lying under

9  oath to a court. And I just want you to make sure you know

10  that.

11     You have no obligation to offer sworn testimony. You can

12  offer other evidence if you wish, and if you wish to waive your

13  right to remain silent, which is a constitutional right, I will

14  have to ask you about that, just, you know, to make sure you

15  voluntarily give it up but -- you know, and you can talk to

16  Mr. Link about it, if you want. That's what he's there for.

17     But before you offer sworn testimony, I need you to know

18  that. You have a constitutional right to remain silent.

19  Giving up that right could subject you to separate prosecution.

20  It's totally up to you.

21     THE DEFENDANT: So I appreciate everything that

22  you've just said to me, Your Honor. So prior to coming to this

23  hearing, like I said, I only get limited time to speak to

24  Mr. Link, and I get most of my time when I show up here to

25  court. Other than that, you know, I'm in a specific set of

1  circumstances, and I am not a profession in this, you know, in

2  this particular profession.

3          THE COURT:  Yep.

4          THE DEFENDANT:  And so I -- at the hearing on the

5  19th, a lot of things that you said stood out to me, and I had

6  to go back, and I needed to process that.  I needed to figure

7  out where was I going to get enough evidence to present to you

8  to get you to understand that I did not do what is being

9  alleged that I did, that I actually did what I was supposed to

10 do.

11      So my declaration simply focuses on paragraph 8, which was

12 a point that you wanted to focus on prior to me submitting my

13 release conditions.  You spoke about -- I guess there are some

14 allegations in memorandum --

15         THE COURT:  Yeah, I would focus on the allegations

16 that are in the violation reports.

17         THE DEFENDANT:  Okay.

18         THE COURT:  Okay?  Because we started to have a

19 conversation that I'm not going to bind myself to, and you're

20 not going to bind yourself to.  We started that hearing and

21 then that hearing had to be cut short.

22         THE DEFENDANT:  Okay.

23         THE COURT:  So that's why we're starting over.

24         THE DEFENDANT:  Okay.

25         THE COURT:  And to the extent there are -- you wish

1   to address the conditions at ECF 13 --

2           THE DEFENDANT:  Yes.

3           THE COURT:  -- those original conditions --

4           THE DEFENDANT:  Yes.

5           THE COURT:  And tell me why the Pretrial's violations

6   are not accurate --

7           THE DEFENDANT:  Okay.

8           THE COURT:  -- the reports.  I'll give you that

9   opportunity.  And then I'm going to turn to the government, and

10  the government will be able to give me whatever argument in

11  evidence they want me to consider.

12          THE DEFENDANT:  Okay.  And so I guess that brings me

13  back to just number eight, specifically.

14          THE COURT:  Okay, sure.

15          THE DEFENDANT:  I really don't recall that really

16  being a focus in any of the memorandums.  It was more so a

17  focus on alleging that I did not adhere to rules, quote, rules

18  of location monitoring, and it was quoted multiple times.

19          THE COURT:  Well, to be clear, so you have an

20  opportunity to respond, the part that is checked is 8(S) three

21  little dots, home confinement.  And it required that you're

22  restricted to a 24-hour a day lockdown at your residence,

23  except for medical, attorney, court, and mental health

24  counseling.  The manner in which that was monitored, that

25  condition was monitored, may have required you to use your cell

1  and the biometric references, right.

2         THE DEFENDANT:  Yeah.

3         THE COURT:  That just, in my view, unless you want to

4  tell me otherwise, I don't see how not checking the box T

5  restricts Pretrial's ability to monitor you with respect to S,

6  because they have to be able to effect the Court's order, and

7  pretrial has discretion in that regard.  So if you want to talk

8  about that, or however else you want to do it, I just wanted to

9  raise that with you.

10         THE DEFENDANT:  So, again, if you -- if I go back to

11  what I spoke about earlier, I totally understand that.  So, you

12  know, just me as a person, I would have some concern as it

13  relates to -- if their requirement is to verify it, then why

14  wouldn't the box be considered checked?  However, I'm not in a

15  position to dispute that right now, but what I can say is that

16  there were multiple methods that the 24-hour home confinement

17  could have been verified, and I feel like they were being done.

18      I have -- I want to submit -- I have a letter from the

19  third-party custodian --

20         THE COURT:  Okay.

21         THE DEFENDANT:  -- that I would like to submit

22  into --

23         THE COURT:  Into evidence?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Okay.  Have you shown that to the

1  government?  Do you only have one copy of it?  Okay.  So why

2  don't you hand that -- if you want to submit that as evidence,

3  hand it to Mr. Link.  Let the government review it.

4          THE DEFENDANT:  Okay.

5          THE COURT:  And then we can mark it as a defense

6  exhibit.  So once, Ms. Johnson, if you are going to admit that

7  letter as evidence, we'll -- we can put it on the Elmo, and

8  that way the government and I can see it at the same time, and

9  you can see it.  Everybody sees it at once.

10      Thank you, Ms. Derro.  That's a good idea.

11          MR. LINK:  Your Honor, it wasn't clear.  The

12  third-party custodian is actually here in court, for

13  Ms. Johnson in court.

14          THE COURT:  That's fine.  If Ms. Johnson wants to

15  proceed by way of a letter from the third-party custodian,

16  that's fine.  It's her hearing so let her do it the way she

17  wants.

18          MR. LINK:  Right.  I just wanted to make sure you

19  were aware that she's here.  That's all.

20          THE COURT:  Okay.

21          THE DEFENDANT:  So --

22          THE COURT:  Hold on before you go on.

23      Ms. Weisman, Ms. Nazmy, can we just put it on the Elmo so

24  that you can read it on your screen, I can read it, and it sort

25  of expedites things?  And Ms. Johnson can see it as we're going

1   through.  Thank you.

2       So, Ms. Johnson, just give us a minute to read this.

3   Okay?  Can you all see it?

4       (Brief pause.)

5           THE COURT:  Okay.  I've had the opportunity to read

6   it, Ms. Johnson.  So if you want to continue with whatever you

7   want me to know and what other evidence you want to put in.

8           THE DEFENDANT:  Yeah, I do want to continue.

9       So I want to -- I'm not sure if I want to submit the

10  memorandums into evidence, but I just want to specifically keep

11  focusing on Section 8(B) because it doesn't really seem to

12  me -- I see the release conditions.  I'm aware of them.  I

13  signed them, and I adhered to them.

14      And so just looking at the memorandums, nothing really

15  stands out in the memorandum that, you know, comes across to me

16  as if there were other allegations of me not having had

17  followed a rule or a release --

18          THE COURT:  Are you talking about the violation

19  memorandums, one, two, and three?

20          THE DEFENDANT:  Yes, ma'am, July 26th.

21          THE COURT:  Yep.

22          THE DEFENDANT:  The 9th, and the 2nd.

23          THE COURT:  I have them.

24          THE DEFENDANT:  And so they all simply just sort of,

25  kind of focus around location monitoring.  They don't really

1  say, well -- you know, it doesn't focus on whether or not I was

2  actually in the third-party custodian's home.  It doesn't

3  really mention -- it doesn't really mention anything about the

4  other release conditions.

5       I actually -- for the most part, just looking at the

6  reports, communication doesn't seem like there was ever an

7  issue.  I clearly, you know, from the time that the release

8  conditions were set, which is -- I believe it was July 22nd, up

9  until August 2nd, which is when the last report was written,

10  that's a little less than three weeks, two weeks.

11       And so it shows a consistent communication between myself

12  and the pretrial worker.  I think with respect to the worker

13  and myself as well, it comes across as if there was more of

14  what I would say like a civil issue, because there were

15  disputes between me and her.  You know, I'm not really going to

16  go into the particulars, but she has an opinion as it relates

17  to, possibly, our tones in communication and things of such.

18  Specifically, I feel like it was in July the 26th's report

19  where, you know, she, you know, mentions tone or, you know,

20  just my volume.

21       I do think it's best, honestly, Your Honor, if I submit my

22  declaration.  I want to read it, but I think it's best, you

23  know, maybe, you know, if it's not good to take the stand --

24            THE COURT:  Well, either way --

25            THE DEFENDANT:  -- if I could just kind of summarize

1    it.

2            THE COURT:  -- if it's a declaration where you're

3    telling me under penalties of perjury it's the truth --

4            THE DEFENDANT:  Yeah.

5            THE COURT:  -- you can do it that way or -- you know,

6    but I just want to make sure you understand the implication of

7    a statement under penalties of perjury.  Otherwise, I'm happy

8    to hear the declaration.  You can put it on the Elmo.  However

9    you want to do it.

10           THE DEFENDANT:  Yeah.  Can you put it on the Elmo?

11   Can I just read it?  Can I just read it before the Court?

12           THE COURT:  You can.

13           THE DEFENDANT:  Okay.

14       So I, Samantha Johnson, the defendant in the above matter,

15   write this declaration of truth in which I swear and attest

16   that all that is included is the truth and nothing but the

17   truth.

18           THE COURTROOM DEPUTY:  Ms. Johnson, please slow down

19   for the court reporter.  Thank you.

20           THE DEFENDANT:  I apologize.

21           THE COURTROOM DEPUTY:  Thank you.

22           THE DEFENDANT:  I'm going to start over if that's

23   okay.

24           THE COURT:  Okay.

25           THE DEFENDANT:  I, Samantha Johnson, the defendant in

1   the above matter, write this declaration of truth in which I

2   swear and attest that all that is included is the truth and

3   nothing but the truth.

4       It is the prosecution's position, in the above matter,

5   that I, the defendant, violated the order setting conditions of

6   release dated July 22, 2021, noting for evidence of the

7   violation three pretrial reports that were drafted and

8   submitted before the courts by the Pretrial Services Officer.

9       I, Samantha Johnson, do not agree in any way with the

10  prosecution's position and/or allegations of any violations of

11  the order setting conditions of release.  I did participate in

12  the hearing before the U.S. District Court held on Zoom, which

13  spoke of conditions of release, and I was provided a set of

14  instructions following the hearing in which I was advised to

15  come to a location in Greenbelt, Maryland, and sign documents.

16      I actually followed those instructions exactly as they

17  were given to me, without any delay.  I did, however, have

18  numerous concerns and questions regarding the reason behind the

19  order itself and the reason behind the suggestions to remain in

20  a third-party's home; however, upon arrival at the Greenbelt,

21  Maryland Pretrial Office, I met with a woman whom was not in

22  any way approachable, later identified to me as my pretrial

23  supervising agent, Leigh A. Messett.  So I put herein after

24  identified as Ms. Messett.

25      On the date of meeting her, which I believe was July 22,

1  2021, she was very rude and aggressive towards me, even going

2  as far as refusing to allow me to come into her office because

3  she was not comfortable with me -- with my wearing of a face

4  shield.

5      Ms. Messett made arguments to me that day in which she

6  said that my face shield was not enough, and that I would need

7  to still wear a mask, even going as far as dismissing my

8  arguments with regard to my health conditions and certain

9  physical disabilities.

10     Ms. Messett actually contacted Attorney Carrie Corcoran

11 and relayed this information to her.  After realizing that the

12 interaction was not beginning well, I complied with the wishes

13 of the pretrial worker, despite my own, and I located a scarf

14 in my vehicle and wrapped it around my face -- and wrapped my

15 face with it, along with my face shield, and went back into the

16 building.

17     I attempted to speak with the Pretrial Services agent of

18 concerns that I had regarding the conditions within the order,

19 as well as concerns with regard to her request of me to

20 download an app into my cell phone and that I was going to use

21 the app to take pictures and send them to her upon her request.

22     My concern with this, and I openly expressed this to the

23 Pretrial Services agent, was that my cell phone service and

24 usage is under a prepaid plan and that I would not be able to

25 download so much data to it.  The pretrial worker's response to

26

1  me was that she was not able to provide me with legal advice,

2  and that if I had concerns regarding my release conditions,

3  that I would need to address them with my attorney; and that if

4  I did not agree to download the app in my phone, that she was

5  going to report this information to the judge, in which I would

6  be arrested.

7       Upon completion of my meeting at the Greenbelt, Maryland

8  Pretrial Office, I immediately went to the third-party

9  custodian's home located in Germantown, Maryland.

10      On July the 23rd, 2021, I was present at the third-party

11  custodian's home with the pretrial agent, Leigh Messett, when

12  she arrived, despite agreeing that the time of her -- despite

13  agreeing that the time of her arrival, I would be -- despite

14  agreeing that the time of her arrival would be 8:30, excuse me,

15  she arrived much earlier.

16      I was never advised that there was going to be a mandatory

17  or needed walk-through of the third-party custodian's home.  I

18  never had a discussion, nor did I agree in any way with the

19  pretrial agent, Ms. Messett, that she would not -- that she

20  could do an entire walk-through of someone else's home.  That

21  would not have been my position or place to make any sort of

22  agreement.

23      After speaking with the pretrial agent, Ms. Messett,

24  regarding her time of arrival, the third-party custodian

25  advised the pretrial agent, Ms. Messett, that she could come in

1  as long as she agreed to wear foot covers, which were going to

2  be provided to her, a face mask, which, strangely, she was not

3  wearing, and that she would need to remain on the first level,

4  which was the level that the defendant -- that I, the

5  defendant, would be occupying.

6      Pretrial agent, Ms. Messett, became extremely aggressive

7  in her tone and apparently agitated with the request of the

8  third-party custodian and began to display herself in a

9  bullying manner to both myself and the third-party custodian.

10     At some point, I was asked by the third-party custodian to

11 excuse myself.  I did not speak directly with Pretrial Agent

12 Messett until on or around July 26, 2021, which is when she

13 contacted me by way of the third-party custodian's personal

14 cell phone.  The pretrial agent, Ms. Messett, wanted me to

15 download an additional app onto my phone and to call her from

16 it.

17     I, the defendant, questioned the pretrial agent of the

18 need to download more apps onto my cell phone and attempted, to

19 the best of my ability, to explain to her yet again that I --

20 excuse me -- that due to my service and my cell phone plan

21 being under the prepaid status, and a limited amount of data,

22 it would not be feasible or possible for me to download another

23 app without completely losing access, as a whole, to Internet

24 and service.

25     I brought to Ms. Messett's attention my release conditions

1    with regard to the placement of the third-party custodian's

2    home, and was attempting to explain to her my concerns

3    regarding my financial status when she abruptly interrupted me

4    and, in a very aggressive tone, verified to me, as Ms. Johnson,

5    and stated that did not have -- that she, meaning Messett, did

6    not have anything to do with that; that if I had concerns with

7    my release conditions, as she informed me before, she cannot

8    give me legal advice, and that I needed to speak with my

9    attorney.

10        She also informed me that she would be reporting to -- she

11   would be reporting the conversation to the judge as

12   non-compliance because there should be no reason why I would

13   not be able or willing to download this particular app.  Her

14   reasoning to me was because of the type of cell phone that I

15   possessed.  I explained to the Pretrial Services Agent that I

16   was beginning to develop a serious uncomfortableness with the

17   interactions that we were having and requested her supervisor's

18   contact information.

19        I informed her that due to her consistent threats of jail

20   or reporting me to the judge, that I no longer felt safe

21   interacting with her and that I was going to be terminating the

22   call.

23        On July the 27th, 2021, I contacted the Pretrial Service

24   Agent, Ms. Messett's supervisor attempting to inform her

25   supervisor of my discomfort with the communication and concerns

1  that I believe were inappropriate on the behalf of the pretrial

2  agent, Ms. Messett. I even requested to be reassigned to a

3  different agent. I was informed that the office was short

4  staffed and that there were only few agents -- there were only

5  two agents available, and that Ms. Messett was the agent for my

6  area.

7       I informed the supervisor that I was appreciative of the

8  time spent in the conversation and that I was advising him

9  verbally of my safety concerns as it related to speaking to the

10  Pretrial Services Agent, Ms. Messett, and that due to those

11  concerns, I would be addressing all further communication with

12  the agent, Ms. Messett, through my attorney.

13      At the time of these interactions, my attorney's name was

14  Carrie Corcoran. The supervisor informed me that that was my

15  choice to do so, and we ended the conversation.

16      All communication from July 27, 2021, until on or around

17  about a very early date in August of 2021, were done by way of

18  the attorney, Carrie Corcoran.

19      On or around August the 3rd, 2021, I received a text

20  message from Attorney Carrie Corcoran informing me that she was

21  no longer my attorney and that she was wishing me well in my

22  legal matter. And then on or around August the 3rd, 2021, I

23  was approached by the third-party custodian informing me that

24  the Pretrial Services Agent, Ms. Messett, was on the phone, as

25  was making inquiries -- and she was making inquiries about my

1   location.

2       The third-party custodian put the phone on speaker, at

3   which point pretrial agent, Ms. Messett, advised me that the

4   withdrawal of -- she advised me of the withdrawal of my

5   counsel.  I informed her that I was aware.  She informed me

6   that based on her understanding, I would be receiving a letter

7   of some sort from the judge shortly after.

8       She also informed me that this information -- excuse me.

9   I would be receiving a letter of some sort from the judge

10  shortly after informing me of this information.  We both ended

11  the call, and I received no further communication from the

12  Pretrial Services Agent, Ms. Messett, or the attorney following

13  that day.

14      So I just put in conclusion, I, the defendant, Samantha

15  Johnson, followed all known release conditions, to include

16  communicating with Pretrial Agent Leigh Messett on a regular

17  basis.

18      I, the defendant, Samantha Johnson, followed all

19  instructions of the Pretrial Services Agent Leigh Messett, to

20  include downloading of apps and communicating with them at all

21  times that were known to me.

22      I, Samantha Johnson, did not violate any location

23  monitoring rules or refuse to follow any location or biometric

24  rules knowingly.

25      I, Samantha Johnson, did follow all of the release

1    conditions.

2         And I simply put in the end that I solemnly swear under

3    the penalties of perjury that this document and its content

4    were drafted, signed, and are true to the best of my knowledge

5    by myself, the defendant, Samantha Johnson.

6         So I feel like it's safe for me to be able to submit this

7    into evidence because it's my truth that I followed the release

8    conditions.

9         So just to sort of, kind of, summarize, because I don't

10   really have -- I want to submit this into evidence.

11              THE COURT:  Okay.

12              THE DEFENDANT:  You know, I don't really know if I'm

13   supposed to specifically go back and just like kind of point

14   out every error that I find in these memorandums.  There are so

15   many errors and violations.  But for the most part, it

16   acknowledges even in these memorandums that whether the

17   check-ins were late or missed, I followed the rules of the

18   release condition.

19        I think that the confusion came in -- and I have my cell

20   phone.  I don't really know how to submit the communication,

21   because, like I said, I felt comfortable with communicating

22   with my attorney, in which I did.  The memorandum points out --

23   tries to, you know, point out negative about me and say that I

24   was in certain areas at certain times.  I was given permission

25   to leave the home to go to the doctors, to do various things,

32

1    and they were orchestrated between my attorney.  The

2    communications were orchestrated between my attorney.

3        The issue came in on August the 3rd, when I received the

4    communication -- it's a -- I have the docket, because -- and I

5    don't really know how much the docket really matters to be

6    submitted into evidence.

7            THE COURT:  I have the docket.  You don't need to --

8            THE DEFENDANT:  It says that the lead attorney was

9    dismissed on the 22nd, which I find that very strange

10   because --

11           THE COURT:  The 22nd of when?

12           THE DEFENDANT:  Of September.  And it's weird to me

13   because on August --

14           THE COURT:  There was an arrest warrant that was

15   issued.  I mean, you didn't respond.

16           THE DEFENDANT:  No.

17           THE COURT:  And Judge Di Girolamo issued an arrest

18   warrant on 7-28-2021.

19           THE DEFENDANT:  Okay.

20           THE COURT:  And then it appears as if the next

21   response from you was a motion that you filed some time later,

22   right, to quash?

23           THE DEFENDANT:  Okay.  So just listening to what you

24   just said to me, and I appreciate that information, I feel like

25   it might make sense tor me to speak on that.

1    So on August the 3rd, number 20 in the docket, it says

2  that there was a proposed sealed document.  From my

3  understanding, based upon the text message that I received on

4  August the 3rd, from Carrie Corcoran, I can only assume,

5  because it says sealed, that that was a motion that was filed

6  by Carrie Corcoran.  She filed a motion to withdraw herself

7  from my representation.  There were some interactions that we

8  had that were not pleasant because of my concerns that I've

9  always had with my release conditions and me wanting her to --

10    THE COURT:  Well, that solves the mystery.  You said

11  it was curious.  It's not curious.  Ms. Corcoran asked to be

12  withdrawn.  The Court looked at that motion and decided that

13  motion and granted it, right?

14    THE DEFENDANT:  Okay.

15    THE COURT:  Yeah, I mean, that's -- well, not okay.

16  I'm asking you because you said it was curious.

17    THE DEFENDANT:  No, no.

18    THE COURT:  So I'm not sure what's so curious about

19  it.

20    THE DEFENDANT:  The part that was curious to me, Your

21  Honor, with that, if she was granted the motion to withdraw

22  herself --

23    THE COURT:  Right.

24    THE DEFENDANT:  -- on August the 3rd --

25    THE COURT:  Yep.

1          THE DEFENDANT:  -- then why does this front page of

2    my docket say that she was terminated on September the 22nd.

3          THE COURT:  I don't -- I don't know, but I don't know

4    why that's relevant.

5          THE DEFENDANT:  Which is fine, and I don't think it's

6    relevant either.  I was just saying that I thought it was

7    curious.  But because you have spoke about some things, I guess

8    I would like to submit these last few documents into evidence.

9          THE COURT:  Sure.

10          THE DEFENDANT:  Because I received a letter, which I

11    don't -- I, for some reason, don't have a copy of it, and my

12    counsel doesn't have a copy of it, but it was read in my

13    original detention hearing.  There was a letter dated

14    August the 5th --

15          THE COURT:  Okay.

16          THE DEFENDANT:  -- that came to the Germantown

17    address, addressed to me from Judge Di Girolamo.  Do you have a

18    copy of that?

19          THE COURT:  I don't unless you know what ECF number

20    it is.

21          THE DEFENDANT:  It's actually not listed on the

22    docket but --

23          THE COURT:  Did you receive this letter?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  At the time it was sent?

35

1        THE DEFENDANT:  Yes.

2        THE COURT:  Okay.

3        THE DEFENDANT:  I received it in the mail at the

4   third-party custodian's home.  It was addressed to me.

5        THE COURT:  On August 5th, 2021?

6        THE DEFENDANT:  Yes, ma'am.

7        THE COURT:  Okay.  Well, if you want me to take a

8   look at it, I'm happy to.

9        THE DEFENDANT:  I don't know how to obtain a copy of

10  it.  It was read to me in my detention hearing and it seems

11  like --

12        THE COURT:  Well, why don't we -- Mr. Link, can

13  you --

14        MR. LINK:  I think -- well, Magistrate Judge Simms

15  read it when we were first before her, and Ms. Johnson

16  indicated she did receive it, as she did here today, but I

17  don't think it's available on Pacer.

18        THE COURT:  Do you want to put it on the Elmo and

19  that way we can all take a look at it?

20        MR. LINK:  I think we're saying we don't have it.

21        THE DEFENDANT:  It was used in my original detention

22  hearing.

23        THE COURT:  Okay.  You know what, we're going to get

24  copies.

25        MR. LINK:  Okay.  Thank you.  We couldn't get it.  We

1    don't have it.

2            THE COURT:  You don't have it.

3            THE DEFENDANT:  Yes, because I would like to continue

4    to explain just some of the points.

5            THE COURT:  Then let's get the letter.  Hold on.

6            THE DEFENDANT:  Okay.

7            THE COURT:  Okay.  And it is on the docket, just so

8    everyone is clear, and let's not put this on the Elmo.

9            THE DEFENDANT:  Okay.

10           THE COURT:  Let's not put this on the Elmo because it

11   is in the docket.  It's ECF 30.  It is currently sealed.

12           THE DEFENDANT:  Okay.

13           THE COURT:  And it's sealed for I think largely your

14   benefit, Ms. Johnson, because it generally talks about

15   appointment of counsel.

16           THE DEFENDANT:  Okay.

17           THE COURT:  But if you wish to raise it, I don't see

18   anything in this letter that's particularly, you know,

19   concerning, but I do want the docket to reflect that it is

20   under seal at least on the docket.  But you do have a copy.

21   The government has a copy.  I have a copy of it.  Okay?

22           THE DEFENDANT:  Okay.  I think I understand what

23   you're saying.  I would still just like to address the fact

24   that --

25           THE COURT:  Sure.

1    THE DEFENDANT:  -- I sent this letter.  So this is --
2 I'm assuming this should be another one of my exhibits.  I'm
3 not really sure.
4    THE COURT:  Did you send -- the letter that you're
5 holding up, you sent it to the court?
6    THE DEFENDANT:  Yes.
7    THE COURT:  All right.  And you sent it -- let's see
8 if we can find it, because I bet you it's on the docket.
9    THE DEFENDANT:  Yes, but it seems to have been
10 entered a little late on the docket.  It's document number 34.
11    THE COURT:  Okay.  And let me just pull it up,
12 because it does have a date of August 17th.
13    THE DEFENDANT:  Yes.
14    THE COURT:  All right.  And so then the docket does
15 reflect ECF 34, and it also reflects the envelope it came in.
16    THE DEFENDANT:  Yes.
17    THE COURT:  And so the envelope is postmarked
18 August 17th as well.  So that shows that's when you mailed it.
19    THE DEFENDANT:  Yes.
20    THE COURT:  All right.  And now I have it up, and it
21 was docketed September 3rd.  So what would you like for me to
22 know about that?
23    THE DEFENDANT:  I would just like to point out that
24 I -- when I received the communication that I guess both my
25 previous attorney and the pretrial worker was speaking about,

1    when I received the communication from the Court, I immediately

2    replied.  I stated that I am in receipt of the letter dated

3    August the 5th.  I gave a specific mailing address because I --

4    you know, regarding my mail, and I told the Court that I was

5    requesting a hearing.

6        You know, at that point, I was under pro se

7    representation.

8            THE COURT:  Right.

9            THE DEFENDANT:  So I wouldn't have known what type

10   of hearing I wanted, but I knew that, regardless, you know,

11   outside of the record, I needed to speak with the Court because

12   something was not being made --

13           THE COURT:  And then you never heard anything?

14           THE DEFENDANT:  I never received a reply to --

15           THE COURT:  Did you hear anything?

16           THE DEFENDANT:  No, ma'am.

17           THE COURT:  Did anybody reach out to you?

18           THE DEFENDANT:  No, ma'am.  I never received a reply.

19   I never heard anything from the courts.

20       This is -- the reason why I filed this motion was because

21   the third-party custodian, she was out doing groceries or

22   something.  She came back, and she told me that she had

23   received a telephone call from somebody who worked at the U.S.

24   Marshal Service --

25           MR. LINK:  ECF 32 so we know what we're talking

1   about.

2        THE DEFENDANT:  -- telling her that they were going

3   to come to her home and, you know, arrest me because I had a

4   warrant.

5        THE COURT:  Okay.

6        THE DEFENDANT:  And it was just concerning to me

7   because I did what everyone had asked me to do.  I wrote the

8   court.  I called the clerk's -- the number on the letter.  I

9   spoke with the clerk and explained to him that I really needed

10  to speak with the judge, that I didn't have a decision on

11  whether or not I was going to move forward representing myself

12  or seeking counsel, but my goal at that point was just simply

13  to get a hearing.

14       THE COURT:  Can I ask you a question about that

15  letter or the motion that you filed at ECF 32?

16       THE DEFENDANT:  Yes, ma'am.

17       THE COURT:  You do note in it that you received

18  communication from Ms. Corcoran informing you of a mandatory

19  hearing scheduled for August 2nd, 2021.

20       THE DEFENDANT:  Yeah.

21       THE COURT:  Did you attend that hearing?

22       THE DEFENDANT:  Yeah, I was present at that hearing

23  with her.

24       THE COURT:  Okay.  And what was that hearing?

25       THE DEFENDANT:  That was -- so I've only been a part

40

1  of two hearings.  One was the hearing on July the 22nd, and the

2  other one was the hearing on August the 2nd.  On August the

3  2nd, Carrie -- can I look at my cell phone quickly?

4          THE COURT:  Okay.

5          THE DEFENDANT:  She sent me text messages where she

6  told me --

7          THE COURT:  That's okay.  Don't worry about it.  I

8  just want to know what that hearing is.

9          THE DEFENDANT:  It was a hearing that was supposed to

10  be -- honestly, I don't know.  She just told me on August the

11  2nd, that I had a hearing.  She sent me a memorandum that is

12  dated on August the 2nd.

13          THE COURT:  Okay.

14          THE DEFENDANT:  And she -- you know, we quickly

15  talked about it, and then I was just to appear before the

16  court.

17      And during that hearing, I tried to speak with the judge,

18  and he stopped me, and he told me to relay all of my

19  communications through my attorney.  And with respect to

20  Ms. Corcoran, because she's not here to defend herself --

21          THE COURT:  That's okay.  I just want to know what

22  that August 2nd hearing was.  You're saying -- because the

23  docket says it's a bail hearing, and it was virtual, and you're

24  saying you did attend a bail hearing?

25          THE DEFENDANT:  Yes, ma'am.  I was present at that

1   hearing, ma'am.  I was present there, and I wanted Ms. Corcoran

2   to speak about my release conditions.

3           THE COURT:  Okay.

4           THE DEFENDANT:  To have my release conditions

5   modified.

6           THE COURT:  All right.  Stop for a second.

7       Government, were you at that hearing, August 2nd?

8           MS. WEISMAN:  Your Honor, there were no in-person

9   hearings in August.

10          THE COURT:  I understand that.  Did you participate

11  by Zoom?

12          MS. WEISMAN:  I believe --

13          THE COURT:  It says bail hearing here.

14          MS. WEISMAN:  Yes, I believe so.

15          THE COURT:  Okay.  And then what happened with all of

16  these violations at that bail hearing?  Because there were two

17  at that point, right?  Am I getting that right?  The April --

18  the July 26th and the August 2nd.  And there was a bail hearing

19  on August 2nd.  What happened?

20          MS. WEISMAN:  Yes, Your Honor.  The judge told the

21  defendant -- the government had asked for revocation.  I think

22  this was the second time we had filed something.

23          THE COURT:  Yep.

24          MS. WEISMAN:  Judge Di Girolamo heard from the

25  government, heard from the defense, and then told the

1  defendant, "I've never had anybody as much trouble this early."

2  He then told the defendant that if there was another violation,

3  and Ms. Messett filed another petition, "I will lock you up.

4  I'm not fooling around."

5          THE COURT:  And what are you reading from?

6          MS. WEISMAN:  My notes.

7          THE COURT:  From that -- okay.

8          MS. WEISMAN:  From that August hearing.

9          THE COURT:  So there was a hearing.  It adjudicated,

10  essentially, the first two and put Ms. Johnson on notice if

11  there were any further difficulties, he was going to revoke her

12  release.  Am I getting that right?

13          MS. WEISMAN:  That's correct.

14          THE COURT:  Okay.

15          MS. WEISMAN:  And the judge told the defendant that

16  the Court was now tightening up again on mask wearing

17  restrictions and set another hearing for September 20th, also a

18  virtual hearing.

19          THE DEFENDANT:  I object.

20          THE COURT:  Well, hold on.  Okay?  You had a bail

21  hearing on that day.  I'm actually asking this question as a --

22  as one that's favorable to you because it's basically saying

23  that there's two violation petitions which were adjudicated,

24  and Judge Di Girolamo adjudicated them, meaning, I'm not -- I

25  I'm not saying I can't consider it, but it is important to me

1  that you appeared and that you answered his questions and that

2  he then said, listen, I'm -- well, he said what he said, but

3  I'm releasing you; just no more violations.

4      So before you object, let me just understand what's going

5  on, and then I'll give you an opportunity.  So hold on.  And

6  just so I'm clear, this was recorded.  This hearing was

7  recorded?  It was virtual but it was recorded?

8          MS. WEISMAN:  As far as I know, yes.

9          THE COURT:  Okay.  All right.

10     Okay, so that's 8-2-2021, at 2 p.m.  And, Ms. Weisman, as

11  far as you know, I just want to -- or maybe, Mr. Finneyfrock,

12  you can help me with this.  At this August 2nd hearing, did

13  Judge Di Girolamo have both the July 26th and the August 2nd

14  violation notice?

15          MS. WEISMAN:  Yes, he did.

16          THE COURT:  He did?  Okay.  All right.

17     Okay, now I'm with you, Ms. Johnson.  Go ahead.

18          THE DEFENDANT:  So I apologize.  The objection is --

19  you know, you see stuff on TV, but I just -- he never advised

20  me, no one advised me of another hearing.

21          THE COURT:  I can pull the recording.

22          THE DEFENDANT:  I have no problem with that, ma'am,

23  because no one mentioned anymore hearings.  We asked.  I was

24  present at that hearing with the third-party custodian.

25          THE COURT:  But did he say to you no more violations?

1  You have to comply; did he say that?

2        THE DEFENDANT:  I recall him being very firm that day

3  about a lot of things, and I tried to speak with him.  I tried

4  to not overtalk my attorney, but I tried to -- the same way at

5  my hearing when you first met me, and I tried to speak, I tried

6  to speak that day --

7        THE COURT:  Okay.

8        THE DEFENDANT:  -- and he told me not to speak.  He

9  seemed to be very upset, and I, just the same like I'm showing

10 respect when you have, you know, told me not to speak or to

11 give you a minute, I listened to him.

12       THE COURT:  Okay.

13       THE DEFENDANT:  And the instructions were to relay

14 the information to my attorney, and I did.  I was sending her

15 text messages and everything asking her regarding the release

16 conditions, because that was what was being spoken about, the

17 release conditions.  And I was following everything that had

18 been advised to me.  And I had issues with my release

19 conditions.  That is how after -- following the hearing, me and

20 Ms. Corcoran went back and forth with each other for quite some

21 time, and she wouldn't file the motion to address my release

22 conditions, which would have prevented me from being in all of

23 this.  She wouldn't do it.

24       What she did was she filed the motion to withdraw herself

25 from my representation, which left me not knowing anything.  I

1  didn't know what was going on.

2         THE COURT:  Well, not -- she filed that motion and

3  then you did know to file a separate motion later.  Right?  You

4  did file something after that, yeah?

5         THE DEFENDANT:  I received the letter.  I received

6  the letter from the courts that I never received a response to.

7  Weeks later I received from the third-party custodian, she told

8  me that a U.S. marshal, a man called her on the phone and told

9  her that I have a warrant for my arrest.  Okay?  That's -- and

10  that they were going to come to her home and get me.

11        THE COURT:  And then you filed a motion to quash.

12        THE DEFENDANT:  I filed a motion.  I filed just -- I

13  just went off of my brain, you know, how courts interact with

14  people.  If the courts have never talked to me, just send them

15  a motion.  I even requested a hearing.  I put defendant's

16  motion requesting to quash.  If there was a warrant, to quash

17  it.  The defendant's motion requesting a hearing before the

18  court.  And I was clear.

19        THE COURT:  But it doesn't work that way,

20  Ms. Johnson.

21        THE DEFENDANT:  I didn't -- ma'am.

22        THE COURT:  Well, then you have to find a way -- if

23  you are -- you are smart enough to figure out all of these

24  arguments that you're making.  You've had probably 15 prior

25  criminal cases.  You have, by my count, nine or ten

1  convictions.  This isn't your first rodeo.  And so to tell me

2  you thought the only way you could now deal with -- after Judge

3  Di Girolamo said no more violations, you could deal with an

4  arrest warrant is to file a motion and nothing else?  Not reach

5  out to the court, not turn yourself in.  You know what turning

6  yourself means.  Everybody does.  I don't believe for a second

7  you don't know what turning yourself in means.

8           THE DEFENDANT:  Ma'am.

9           THE COURT:  Yeah.  So tell me why the only remedy you

10  had at this point was to write a motion to quash an arrest

11  warrant and not appear in court or attempt to appear in court,

12  call your pretrial officer.

13           THE DEFENDANT:  The pretrial worker stopped

14  communicating with me.  Okay?  I tried to call her.

15           THE COURT:  Did you try?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  When?

18           THE DEFENDANT:  On August the 3rd, when I received

19  the communication, the pretrial worker called me.  I wrote that

20  in my declaration.  She called me, and she told me that I would

21  receive further communication from the court, and that was the

22  last time that I heard from her.

23           When I received --

24           THE COURT:  Did you hear on the 5th, the 6th, the

25  7th, the 8th, and the 9th the monitoring service that you had

1   to check in?  And each time you checked in either late -- I

2   mean, pretrial was still in touch with you, right?

3          THE DEFENDANT:  No, ma'am.  The monitoring service

4   was still in contact with me, but I had not heard anything else

5   from anybody, from pretrial or from my attorney, until I

6   received the letter.  When I received the letter, I --

7          THE COURT:  Which letter?  I'm sorry.

8          THE DEFENDANT:  The letter from the judge.

9          THE COURT:  The one that you talked about earlier --

10          THE DEFENDANT:  Yes.

11          THE COURT:  -- about the lawyer?

12          THE DEFENDANT:  And it has a telephone number on

13   there --

14          THE COURT:  Okay.

15          THE DEFENDANT:  -- to call a clerk.

16          THE COURT:  Okay.

17          THE DEFENDANT:  I called him.  I asked about a

18   hearing.  He told me that he was going to call me back.  He was

19   going to get back with me.  I never heard anything else from

20   the clerk, from the attorney, from anybody.

21          But I responded to the letter requesting a hearing to come

22   before the court because of my concern of how everything was

23   playing out.  Without, you know -- Ms. Simms, and I'm sure you

24   might say, but I have been mentioning how all of this, how I

25   found out about all of this because of my car getting taken off

1   of the side of the road.  My car was picked up.  I tried

2   calling attorneys.  They told me they couldn't help me get my

3   car back.  I called the Federal Public Defender Services and

4   left a message.

5           THE COURT:  When did that happen?

6           THE DEFENDANT:  On July the 5th, I came outside in

7   Washington, D.C.

8           THE COURT:  2021?

9           THE DEFENDANT:  2021, yes, ma'am.  And my car was

10  gone from off of the side of the road.  I also have text

11  messages in my phone where Carrie -- I asked Carrie.  I said,

12  based upon the information, after getting down to the bottom of

13  it, I asked her if I should come to the court and turn myself

14  in, and Carrie told me not to do that.  She's the one that told

15  me not to come to the court and turn myself in.  I have these

16  messages in my phone.

17          THE COURT:  Is Ms. Corcoran still representing you?

18          THE DEFENDANT:  Yes.

19          THE COURT:  She's not representing you, and you still

20  didn't turn yourself in.

21          THE DEFENDANT:  No, listen.  Ma'am, what I'm saying

22  is --

23          THE COURT:  Listen.  This is how we're going to do

24  it.  We've been going for an hour.  I am truly trying to follow

25  this, but it -- where I am right now in the chronology is that

1  you had a hearing in front of Judge Di Girolamo on August 2nd,

2  and Judge Di Girolamo told you no more violations.  Then

3  Ms. Corcoran moved to withdraw.  And in September -- in August,

4  the next day, and then it was granted in September.  That's so

5  far where I am.

6       On the 10th, there was a third violation report,

7  August 10th, and that triggered an arrest warrant.  Okay?  And

8  that -- that went out on the 13th.  You've already told me you

9  knew about that, which is why you then filed a motion to quash.

10      You do let the court know where you're living.  You file a

11  motion to quash, and then it appears like there may be a second

12  motion to quash in April of 2022.  That's where I am in the

13  docket.  Take me through sort of in order --

14            THE DEFENDANT:  Okay.

15            THE COURT:  -- what you want me to know next.  Okay?

16            THE DEFENDANT:  Okay.  So if we're not focusing on

17  what I was trying to tell you about --

18            THE COURT:  No, that's not accurate, ma'am.  What I'm

19  trying to do is impose some order here.

20            THE DEFENDANT:  Okay.

21            THE COURT:  Because the more I'm trying to understand

22  this, the more you just want to sort of jump around and tell me

23  what you want me to know, as opposed to what I need to know to

24  decide this motion.  I'm giving you a full and fair opportunity

25  to be heard, but I am going to take exception to this notion

1    that I cut you off.

2              THE DEFENDANT:  Okay.

3              THE COURT:  Okay?  That's not happening.

4        What I'm asking you to do is impose a little bit or order

5    on this, because you're quite capable of doing that, and I want

6    to know step by step why you took the actions that you did, if

7    you want to be heard on that.

8              THE DEFENDANT:  Okay.  So I think what you're saying

9    to me is to focus on after the hearing from the 2nd.

10             THE COURT:  Very good, yes.

11             THE DEFENDANT:  Okay.

12             THE COURT:  Yep.

13             THE DEFENDANT:  So in the hearing from the 2nd, I was

14   being represented by someone else.  I don't know what was --

15             THE COURT:  You had a lawyer at that point?

16             THE DEFENDANT:  On August the 2nd, Carrie Corcoran

17   was my attorney.

18             THE COURT:  And then what?

19             THE DEFENDANT:  So --

20             THE COURT:  Did you have a lawyer after that?

21             THE DEFENDANT:  No.  After August the 3rd, I was not

22   represented.  But if I understand what you're asking me, on

23   August the 2nd, if you listen to the hearing, I attempted to

24   speak to the judge to get them to see that I needed to talk for

25   myself, and he cut me off.  At that point, with all due

1  respect, ma'am, I don't know where you guys are getting most of

2  the information from regarding my background, but this, for me,

3  is a major point in my life.

4          THE COURT:  Okay.

5          THE DEFENDANT:  And so with my car being taken and

6  all of this stuff, no, I just tried to talk.  Okay?  I have

7  been afraid, stressed out, everything, and I just tried to

8  talk.  And when he cut me off and said, don't say anything, I

9  started talking to her --

10         THE COURT:  Okay.

11         THE DEFENDANT:  -- through the text messages because

12 I've never even met her.  I've never seent [sic.] her in

13 person.  I've never been given a document or nothing to sign

14 from her.  I just called her, called the office and left a

15 message telling them that my car was gone, and a lady called me

16 back, which was her, telling me that she could help me get my

17 car back.  And then we are here.

18         THE COURT:  Okay.

19         THE DEFENDANT:  Okay.  So from August the 3rd, when I

20 had no representation, looking at this docket, it seems like so

21 much took place in this docket that I was never notified by.

22 If I was representing myself, then why wouldn't -- and they

23 were aware of this, excuse me, the prosecution, not they, but

24 if the prosecution was aware that I was --

25         THE COURT:  Do you have the docket in front of you?

1       THE DEFENDANT:  This was printed and just given to me

2   on 5-13-2022.

3       THE COURT:  So you have it?

4       THE DEFENDANT:  Yes, ma'am.

5       THE COURT:  Okay.  And at 27, ECF 27, there is an

6   arrest warrant for you.  Then you file a week later a motion to

7   quash the arrest warrant.  So you know about it and you filed

8   something.

9       THE DEFENDANT:  Yes.  I filed the motion because the

10  third-party custodian came home and told me that somebody

11  called her over the telephone.

12      THE COURT:  I understand.

13      THE DEFENDANT:  Yes, and said that they were going to

14  come to her house and get me.  So I didn't file it.  She --

15      THE COURT:  But you knew about it.  You knew about

16  the warrant.  You knew about what was going on, and you filed a

17  motion.  That's all I want to establish.

18      THE DEFENDANT:  Yes, ma'am.

19      THE COURT:  Okay.

20      THE DEFENDANT:  I filed the motion, but I didn't

21  actually file it, is what I'm trying to say.  Somebody else

22  filed it on my behalf.

23      THE COURT:  Who did?

24      THE DEFENDANT:  I asked a friend to bring it to the

25  courthouse and file it for me.

53

1          THE COURT:  Not a lawyer for you, not someone
2   representing you?
3          THE DEFENDANT:  No.
4          THE COURT:  A friend?
5          THE DEFENDANT:  No -- yes.
6          THE COURT:  Okay.
7          THE DEFENDANT:  I just asked somebody if they could
8   come and file it.  The only thing that I just did was just, you
9   know, just try to put it through my brain what I could on
10  paper, what I felt like all has been going on, and trying to
11  get somebody to -- get a court to acknowledge me, because,
12  again, nobody answered my letter.  Nobody was communicating
13  with me.
14      The lady at the pretrial office stopped talking to me, and
15  she told me that she couldn't give me legal advice.  Carrie was
16  gone so I didn't have any -- I didn't have anybody to help me.
17  But I always communicated with this court.  I never ignored the
18  court.  I never violated the release conditions.  I just
19  listened to what everybody was telling me, because they took my
20  car.
21      So after I filed the motion or all of this other stuff
22  that happened -- look, I didn't know any of this stuff was
23  going on.  The things that took place on August the 13th, the
24  things that took place on, it looks like, August the 23rd,
25  responses, oppositions, I didn't know about any of this stuff.

1  The only thing that --

2      THE COURT:  Here's the thing.  Here's what's really a

3  stumbling block for me.  You knew about the criminal charges.

4  You knew you had to answer to those criminal charges.  You knew

5  you had an arrest warrant out for you, and yet your complaint

6  is that you do not know about other aspects of your case.  What

7  more did you need to know --

8      THE DEFENDANT:  I would like to be clear that I was

9  not aware of criminal -- I was not aware of criminal charges.

10     THE COURT:  You had a complaint, and you had an

11 initial appearance on that complaint.

12     THE DEFENDANT:  If you look at the docket, do you see

13 that it said that it was waived?  Carrie told me -- I asked her

14 if I needed to turn myself in.

15     THE COURT:  No, I'm talking about the first time you

16 had your appearance in this case.  And there is a complaint

17 against you, there are charges filed, and you have an initial

18 appearance.

19     THE DEFENDANT:  On July the 22nd.

20     THE COURT:  Okay.

21     THE DEFENDANT:  Yes.

22     THE COURT:  On July the 22nd.

23     THE DEFENDANT:  Yes.  And I signed my release

24 conditions, and I followed the instructions.

25     THE COURT:  And so you knew at that point you had

1  criminal charges.

2          THE DEFENDANT:  I knew that something was going on in

3  court.

4          THE COURT:  You knew you had criminal charges.

5  Ms. Johnson, come on now.

6          THE DEFENDANT:  Yes.  Yes, ma'am.  Yes.

7          THE COURT:  Okay.

8          THE DEFENDANT:  But I followed the instructions to go

9  to the Greenbelt office.  There was no like a scheduled status

10  hearing or anything like that.  Okay?

11          THE COURT:  Okay, that I want to ask the government

12  about at some point because I don't -- I mean, I don't see like

13  a next date.  There is always a next date.

14          THE DEFENDANT:  Exactly.

15          THE COURT:  And I don't see one.  So that is one

16  thing that I want to get straight in terms of the chronology.

17  Maybe it's in the oral.  Maybe it's in the recording, but where

18  I'm having a little bit of trouble following the bouncing ball

19  is what date was scheduled after August 2nd that Ms. Johnson

20  was supposed to appear for?  Whether it was given to her at the

21  initial appearance when release conditions were set, or whether

22  it was given to her August 2nd, there is always a date by which

23  something happens, an election hearing, a trial date.  I'm not

24  seeing it.  So maybe you can tell me, Ms. Weisman, where I'm

25  supposed to look.

1        MS. WEISMAN:  Your Honor, I understand this is very

2    confusing.  The government filed our complaint and arrest

3    warrant with the court under seal on June 30th.  Somehow

4    somebody told the defendant about the warrant.  I don't know

5    how; however --

6        THE COURT:  You mean the first warrant?

7        MS. WEISMAN:  The original warrant.

8        THE COURT:  Okay, 7-1-2021.

9        MS. WEISMAN:  So on July 9, 2021, Ms. Corcoran filed

10   a motion to quash the arrest warrant, and she waived the

11   initial appearance and asked that the case be set for trial.

12       THE COURT:  Okay.

13       MS. WEISMAN:  And that day the government moved to

14   unseal because there seemed to be no reason to keep it sealed.

15       THE COURT:  Okay.

16       MS. WEISMAN:  The defendant was on pretrial --

17       THE COURT:  There was a bail review hearing, it looks

18   like, on ECF 12, on July 22nd, right?

19       MS. WEISMAN:  Yes.  Somehow pretrial got involved.  I

20   think because --

21       THE COURT:  Ms. Corcoran was involved and let's get

22   this case going.

23       MS. WEISMAN:  Yes, and pretrial was involved.

24       THE COURT:  Okay.

25       MS. WEISMAN:  So on July 22nd, there was a bail

1  review, and I was the prosecutor for that date.

2          THE COURT:  Okay.

3          MS. WEISMAN:  The government moved for detention.

4  There never had been an initial appearance at that point, but

5  that was because --

6          THE COURT:  So Ms. Johnson never had an initial where

7  she was advised of the charges and given a next date?

8          THE DEFENDANT:  No.

9          MS. WEISMAN:  Ms. Corcoran waived it on July 9th.

10         THE COURT:  Okay.  I get that part.  But then there

11 is a point at which Ms. Johnson appears before the judge for

12 the first time.

13         MS. WEISMAN:  Yes.  And that was on July 22nd.  There

14 was a bail review, virtual bail review.

15         THE COURT:  At that point, was Ms. Johnson advised of

16 the charges, maximum penalties, and rights under it?

17         THE DEFENDANT:  No.

18         THE COURT:  Or was it a -- I mean, I may have to go

19 back and listen to it.

20         MS. WEISMAN:  I don't think so, because she had filed

21 an affirmative waiver of it.

22         THE COURT:  No, I get it, but at some point, right,

23 you would agree that, waiver or not, someone needs to

24 communicate with the defendant that there is a date by which

25 she is to appear, and that date doesn't go away just because an

1  arrest warrant issues, customarily.  And so, in theory, there

2  is a date by which the defendant knows to come and say, you

3  know, my bad, or whatever, but there is a date, and I don't see

4  one.  I don't see like an elections hearing.  I don't see

5  anything on the docket.  So that's what's concerning me.

6          MS. WEISMAN:  During the pandemic, there was no

7  court.

8          THE COURT:  There were what?

9          MS. WEISMAN:  There just was no mag court, no

10 misdemeanor magistrate routine court.

11         THE COURT:  So if I'm getting Ms. Johnson right, and

12 I'm not -- believe me.  We still haven't talked about all of

13 the -- you know, Ms. Johnson, you don't get to dictate the

14 terms of pretrial.  You just don't.

15     But this is where I have a problem with what's going on.

16 Ms. Johnson doesn't have counsel by August 3rd.  She is getting

17 notice of the arrest warrant.  She's pro se, and she's reaching

18 out to the court.  She's reaching out to the court not only to

19 get a new lawyer, but to deal with this warrant, and, if I'm

20 getting it right, no one responds to her?

21         MS. WEISMAN:  No, Your Honor.  We did have a hearing.

22 We had a virtual hearing on July 22nd.

23         THE COURT:  And then you had a virtual hearing on the

24 2nd.  And after that -- right.  So Ms. Johnson -- take me from

25 August 2nd.  Ms. Johnson is on release still.

1    MS. WEISMAN:  Yes.

2    THE COURT:  And she doesn't -- according to pretrial,

3    she violates again.  An arrest warrant issues.

4    MS. WEISMAN:  Yes.

5    THE COURT:  She now doesn't have a lawyer, right?

6    MS. WEISMAN:  On -- I'm sorry.

7    THE COURT:  And on the 13th, an arrest warrant

8    issues; and on the, what is it, 20th -- or when did she file

9    her first motion to quash?

10    MS. WEISMAN:  Your Honor, the hearing -- at the

11    August 2nd hearing, Judge Di Girolamo scheduled a status

12    hearing.

13    THE COURT:  Okay.  On what date?

14    MS. WEISMAN:  For September 20th at 1 p.m.

15    THE COURT:  And that's not on the docket?  I mean,

16    it's not a marginal order, or is it?  Ms. Weisman, can you tell

17    me where I should look to see that everyone was on notice there

18    was a status for 9-20?

19    MS. WEISMAN:  My notes -- Your Honor, I don't have my

20    computer with all the docket entries.  My notes indicate that

21    on August 26, 2021, Judge Di Girolamo signed a marginal order

22    denying the motion to quash.

23    THE COURT:  No, I see that.  I get that.  And how --

24    let's see -- and it wasn't mailed.  Right?

25    MS. WEISMAN:  I don't know.

1       THE COURT:  Well, I can tell you it wasn't mailed

2   because when it is mailed, it says CM next to it.  Am I right

3   about that, Ms. Derro?  So there is no indication -- at this

4   point, there is a pending motion for Ms. Corcoran to withdraw,

5   and as far as Ms. Johnson is concerned, she doesn't have a

6   lawyer, and that is reflected in the fact that she files a pro

7   se motion to quash.  And I'll note, she did what Ms. Corcoran

8   did.  Like, there is some logic to it because that's what

9   Ms. Corcoran did to begin with.  That's her way of saying, here

10  I am, Judge.  I get you on the warrant.  In a perfect world,

11  yes, she would have turned herself in, but we know with the

12  pandemic, there wasn't any turning oneself in.  I can't even

13  find the next hearing date.

14      On the 26th, Judge Di Girolamo issues a marginal order,

15  but there is no indication that this was communicated to

16  Ms. Johnson.  Ms. Corcoran has already filed her motion to

17  withdraw.  And so I don't even know if Ms. Johnson -- how she

18  would have gotten this, necessarily.

19      MS. WEISMAN:  Your Honor, she's not charged with

20  missing a hearing date.

21      THE COURT:  No, I understand that, but I also have

22  to -- oh, and by the way, the docket makes clear that

23  Ms. Corcoran is out as of August 27th.  So the reason why

24  that's relevant, in my view, is because who is going to

25  communicate to Ms. Johnson that her motion was denied?

61

1    The reason why that's relevant is because in her -- in

2  Ms. Johnson's mind, that was the way of dealing with this

3  warrant.  And now she hasn't heard back as to what's going on

4  with it, and now she doesn't have a lawyer to communicate it to

5  her.

6    So the next thing that happens is Ms. Johnson made sure

7  that this court knows where she's living.  I'm not forgiving

8  the violations.  I'm just saying that Ms. Johnson, at ECF 34,

9  says, Court, this is my new address, and then files a second

10  motion in April.  There is no communication with Ms. Johnson on

11  the docket from September to April.  None.  There is no letter

12  that goes out that says we denied your motion to quash.  There

13  is no letter saying you must appear on these charges.

14    And so that's why to me it's like it's all out in the

15  ether, and, customarily, we just don't -- I mean, under the

16  rules, we don't work that way.  There has to be a date for

17  someone, even if they are under a warrant status, to appear.

18  So help me out.  Where is that date?

19        MS. WEISMAN:  Your Honor, orally, according to my

20  notes -- I don't have a transcript of what happened; however,

21  orally, on August 2nd, Judge Di Girolamo scheduled a status

22  hearing for September 20th of 2021, at 1 p.m.

23        THE DEFENDANT:  That's not true.

24        THE COURT:  Well, I don't have any record of that.  I

25  mean, I can listen to it, but, frankly, the way that this

227

1  entire case has gone down, I'm not sure I'm going to hold

2  Ms. Johnson to that when it is at -- a virtual review of

3  release conditions where Ms. Corcoran is trying to get out of

4  the case and no follow up with a date on the record.  I mean,

5  there is not even like a clerk summary.  Am I seeing that --

6  Ms. Derro, do you see any -- so I don't know if I'm going to

7  hold Ms. Johnson to that.

8       And when that date came, did anybody appear?  In other

9  words, did you have a hearing on that date?  A status?  Because

10  if there were one, then we would have expected to see everybody

11  enter their appearance on that day, the Court say, well,

12  Ms. Johnson isn't here; there is an arrest warrant; we're going

13  to have to just wait to see what happens next with regard to

14  that warrant.  But the hearing would be held.

15       Do you see what I'm saying?  Like, there's nothing on the

16  docket.

17          MS. WEISMAN:  Yes, I do.  And to be honest, there

18  were not scheduled court dates at that time.

19          THE COURT:  I understand that, but even the status

20  that you're saying --

21          MS. WEISMAN:  So I don't know what happened.

22          THE COURT:  Even the status that you're saying was

23  set, if the Court was going to follow through on that, that day

24  chambers and the parties would have made arrangements for that

25  follow-up.

1          MS. WEISMAN:  And the reason nothing followed was --

2          THE COURT:  Okay.

3          MS. WEISMAN:  -- pretrial followed the third -- filed

4  the third violation.

5          THE COURT:  Why does that -- okay.  Go ahead.

6          MS. WEISMAN:  Pretrial had lost all contact with the

7  defendant.

8          THE DEFENDANT:  That's not true.

9          THE COURT:  But that doesn't explain why the status

10  didn't happen.  What was the purpose of the status?  Take a

11  status.

12          THE DEFENDANT:  That's not true.

13          THE COURT:  I mean, the violation would have come up

14  at the status.  That's why it doesn't -- that doesn't explain

15  why the status wasn't formally scheduled and occurred.  The

16  court didn't know that Ms. Johnson wasn't going to appear.

17  There is no reason to believe at that August 2nd virtual bail

18  review that Ms. Johnson would not appear on the day she had the

19  status.  She was there for that one.

20      So this is maybe -- I'm not blaming anybody here.  I'm

21  just saying that COVID threw a wrench into everything, and, in

22  fairness, I just need to make sure that the record is clear as

23  to what is Ms. Johnson's responsibility and fault and what

24  isn't.

25          MS. WEISMAN:  Well, Your Honor, we're not -- there is

1   nothing alleging the defendant failed to appear.  The

2   allegations are that the defendant failed to follow the

3   instructions of her Pretrial Services Officer.

4            THE COURT:  I get it.  I get it.  But failures to

5   appear are part of reasonable instructions.  I mean, if the

6   judge says you appear and the defendant doesn't, then that

7   matters for -- regarding -- pretrial is an arm of the court.

8            MS. WEISMAN:  Of course.

9            THE COURT:  It also matters with respect to whether

10  the conditions are clearly communicated to the defendant.

11      Now, I haven't even given you an opportunity to address

12  the merits of the violation reports, but this is all really

13  important in terms of the chronology, and so I just wanted to

14  get it right, and, at least with respect to this case, it

15  jumped the rails.  I mean, that's -- that's clear to me.

16       And so where we are in the chronology is status never

17  happened, and it wasn't on the docket.  We've got the defendant

18  moving to quash on the 20th, it being denied, but never

19  communicated to her.  We have her reaching out with a second

20  motion to quash, which is still pending April 27th of this

21  year, and then we have -- we're here.  Now we're here because,

22  according to Mr. Link, who told me last time, Ms. Johnson has

23  an open case in D.C.  She voluntarily appeared, and she pretty

24  much knew that that would result in this warrant likely being

25  served as a detainer, and here we are.

1    So that's all I need right now in terms of the chronology.

2  There wasn't any -- and I've got confirmation there wasn't any

3  other hearing scheduled in this case other than what you just

4  told me.

5          MS. WEISMAN:  That's correct.  But we're not alleging

6  a violation based on a failure to appear at all.

7          THE COURT:  I get it.  I get it.  But it's relevant

8  and so that's why I wanted to make sure I understood it.  Okay?

9      So, Ms. Johnson, I'm up to date on the chronology.  I

10  think I get it now.  What else do you want me to know?

11         THE DEFENDANT:  If I was just to process what I was

12  just listening to that you guys were speaking about, when I was

13  brought before the court on the 6th, I believe, the terms

14  changed, and it said that I was being brought before the court

15  on a detention hearing for having had violated pretrial

16  release.  I wasn't never even notified by anybody of a

17  violation.

18         THE COURT:  So you're saying you never received that

19  August 3rd violation?  But you also didn't stay in touch with

20  pretrial.  You're saying it's because pretrial discontinued

21  communication with you.

22         THE DEFENDANT:  On August the 3rd, the lady called me

23  on the phone to update me that my counsel was gone.

24         THE COURT:  Yeah.

25         THE DEFENDANT:  She told me that she couldn't give me

1  legal advice, and that I needed to wait for further

2  communication from the court.

3          THE COURT:  And you're saying you got known?

4          THE DEFENDANT:  I received -- no.  What I'm saying is

5  that I received a letter that was dated August the 5th from the

6  judge.

7          THE COURT:  About no lawyer.

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.

10          THE DEFENDANT:  And telling me, you know, that I

11  shouldn't represent myself and saying to me that I needed to

12  call the telephone number, which I'm telling you that I called

13  the number.  I spoke with a clerk.

14          THE COURT:  Right.  No, I got that.

15          THE DEFENDANT:  And he told me he was going to get

16  back to me, and I never heard from anybody ever again.

17          THE COURT:  Okay.  I understand that.  And then that

18  was it?

19          THE DEFENDANT:  Can you just give me one second,

20  please?

21          THE COURT:  Sure.

22      (Brief pause.)

23          THE DEFENDANT:  Okay.

24          THE COURT:  What prompted you to file the second

25  motion to quash in April of 2022?

1    THE DEFENDANT:  Well, I had been going to my D.C.

2  hearings just fine, and I've been acknowledging everything from

3  my pretrial, and somehow a report came about that spoke about a

4  warrant, but the issue is -- and I don't know if the arguments

5  are supposed to be before this court or in the D.C. court, is

6  that in the pretrial report, the case number is listed

7  differently.

8    So I had been calling -- I've been contacting this court,

9  the Baltimore, the D.C.  I've been calling all of them asking

10  for help and talking to them, and I get nowhere over and over

11  again.  I came to this court.  I've asked, because I was trying

12  to explain to them that the pretrial report kept talking about

13  a warrant.  Okay?  My attorney -- and I don't know if I should

14  bring her name on the record or not.

15    THE COURT:  Well, you're saying in the D.C. case you

16  have a lawyer?

17    THE DEFENDANT:  Yes.

18    THE COURT:  Okay.

19    THE DEFENDANT:  She brung me here in April.  She

20  brung me to this courthouse, and we went into the clerk's

21  office to address the pretrial report that says that I have an

22  extraditable warrant that is only extraditable out of

23  Washington, D.C.  When she brung me here, and we went into the

24  Clerk's Office, they didn't give us no information about a

25  warrant existing or anything.  The only thing that they keep

68

1    talking about is that the last known -- she kept saying

2    something about the 22nd.

3           THE COURT:  Who is the attorney?  I do want to know

4    who the attorney is.  What's her name?

5        (No response.)

6           THE COURT:  This is a person who represents you on a

7    criminal charge in D.C.?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Who is it?

10       You don't have to tell me, but I'm just saying that any

11   criminal defense attorney who is coming into this court to try

12   to figure out a warrant might go to the Clerk's Office but also

13   might go to the marshals.  So I'd like to know who it is.  It

14   just doesn't make a whole lot of sense to me.  If you're a

15   defense attorney and you want to clear up a warrant, you don't

16   end -- you don't file a motion to quash, number one, and leave

17   it there.  You go down to the marshals and you ask.

18           THE DEFENDANT:  She was just trying to help me.

19           THE COURT:  I understand that, but you understand my

20   concern.

21           THE DEFENDANT:  I understand what you're saying,

22   ma'am, but I don't -- I'm not a person like this and a lot

23   of -- I understand enough to try to maneuver myself through

24   this hearing.

25           THE COURT:  All right, go ahead.  I'm sorry.  Go

1  ahead.

2  THE DEFENDANT:  With all due respect, I'm just trying

3  to defend myself.

4  THE COURT:  No, I get it, but when you bring up

5  certain things, it's fair to ask a question.

6  THE DEFENDANT:  I'm only bringing it up to say that I

7  came -- because you asked me how did I find out.  And I found

8  out through a pretrial report, and I was brung here because

9  they were saying that they didn't -- if I would have -- it

10  didn't settle well with them to walk a defendant into court and

11  not leave with them, and so we were trying to address this

12  before my upcoming hearing, which, you know, goes to me

13  speaking that I'm not a flight risk.

14     I had a hearing.  The pretrial report that kept being

15  submitted towards the court kept telling the courts that I had

16  an extraditable warrant.  I don't know if you have -- since

17  everything is cancelled, does anybody have a copy of my

18  pretrial report?

19  THE COURT:  I do.  I have it.  I'm looking at it

20  right here.

21  THE DEFENDANT:  It speaks about a warrant in there.

22  THE COURT:  Yep, I see it.

23  THE DEFENDANT:  And it talks about a case.

24  THE COURT:  Yeah, and if you come to this Clerk's

25  Office, they will check it.  And I'm looking at it right here,

1  and it's the right case number.

2        THE DEFENDANT:  I'm not sure what you --

3        THE COURT:  I'm --

4        THE DEFENDANT:  Okay, then you don't have the second

5  one, which is fine, but either way there was a --

6        THE COURT:  It doesn't matter.  A lawyer coming into

7  this court would give your identifying information, and the

8  Clerk's Office would check it by name and by case number.

9  So -- and the case number in this report is correct.  And even

10 if it weren't, if you came to the Clerk's Office, they would

11 check it many ways.

12       THE DEFENDANT:  When I came to the Clerk's Office on

13 April the 26th, I asked the clerk that was sitting there, I

14 asked about my warrant.  I asked all of the questions that I

15 needed to ask.  And there was no clear information or any

16 indication of a warrant existing.

17    What was explained to me was that there was one final

18 docket entry but that docket entry dated all the way back to

19 September, September the 22nd.  So what I said, to satisfy the

20 person that had brung me to court, because I'm trying to make

21 clear what I've been saying all of this time, is that I have

22 not been avoiding any hearings, avoiding anybody, that all of

23 this stemmed from my car getting taken off the side of the

24 road.

25    I asked them if there was a precipe form where I could

1  fill out so that I could ask that if there was a motion or

2  anything, at least to just get me a hearing so that I could

3  come to the courts to find out what's going on.

4         THE COURT:  And that was on April 22nd.

5         THE DEFENDANT:  I wrote this.

6         THE COURT:  You asked for a hearing on the 27th?

7         THE DEFENDANT:  Yes.

8         THE COURT:  Yes, okay.

9         THE DEFENDANT:  I wrote this and I filed it and I sat

10  and I waited for a reply to see if somebody would send me

11  anything or if somebody would communicate with me.

12         THE COURT:  And you didn't get anything?

13         THE DEFENDANT:  I didn't receive any response.  What

14  happened to me is that I went to court, like I'm supposed to,

15  and when I got to court, an arrest warrant was given to me.

16  And in my opinion, Your Honor, with all due respect, it didn't

17  even look real.

18         THE COURT:  Well, that doesn't matter.  It was real,

19  and that's how you got here.

20         THE DEFENDANT:  Yes.

21         THE COURT:  Okay.

22         THE DEFENDANT:  So I was advised to -- I turned

23  myself in.  I went to court.

24         THE COURT:  Yep, I see it.  And you did ask for a

25  hearing.

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.

3          THE DEFENDANT:  I've always been asking for a

4   hearing.  I have always tried to communicate with the court.

5   I'm not trying to dictate my release conditions.  My issue with

6   my --

7          THE COURT:  Okay, so here's the thing now,

8   Ms. Johnson.  I get it in terms of your voluntariness to appear

9   in court.  All right.  And as Ms. Weisman points out, she's

10  right, there is not a -- there is not a big concern on my part

11  that you were -- you were trying to get to court.  Okay?

12       Now we're here, and now we have to discuss, in my view,

13  the most recent violation report, the August 9 violation

14  report, which was after Judge Di Girolamo said no more, no more

15  violations, no more difficulties.  Comply.

16       And I've got this violation report which alleges

17  repeatedly that you did not comply with how pretrial was

18  monitoring your location and that you would turn off your

19  location device.  You would not respond immediately.  You

20  wouldn't check in when you were supposed to.  I mean, there is

21  -- you know, there's several dates from the 3rd to the 9th of

22  these alleged violations.

23       I want to give you an opportunity to respond to whatever

24  is in the 9th violation, and then I'm going to turn to the

25  government.  Okay?

73

1          THE DEFENDANT:  My response is very similar to my

2  previous -- the previous violations.  Focusing on the fact that

3  the location monitoring is not selected, which is in one of my

4  exhibits, and if anybody has heard anything that I've been

5  saying, I tried to communicate with my previous attorney to get

6  her to understand that something -- there was -- there just

7  seemed to be something wrong with the communication between

8  myself and my pretrial worker.  I was not -- I could tell her

9  that she looked beautiful today, and that would turn into an

10 argument.

11         THE COURT:  But I've got to ask you very

12 specifically.  There are several allegations that you did not

13 check in when you were supposed to.

14         THE DEFENDANT:  Those are not true.

15         THE COURT:  You just deny them outright?

16         THE DEFENDANT:  No.

17         THE COURT:  Okay.

18         THE DEFENDANT:  Listen.

19         THE COURT:  Okay.

20         THE DEFENDANT:  I spoke about the data on my phone.

21 Even just sitting here trying to think of things, okay, these

22 reports are sort of, kind of like hearsay.  The person that is

23 writing these reports are not here.  The biometric system is an

24 app that is created by a person, somebody.  Okay?

25         THE COURT:  Okay.  Ms. Johnson, I've got to tell you,

1   we've been going an hour and a half.  At some point I have to

2   turn to the government.  You've made these arguments before.

3   You attribute it to no data on your phone and the fact that

4   it's not really a condition of your release.  Is there anything

5   new you want to tell me before I give the government an

6   opportunity?

7            THE DEFENDANT:  Yes, that these -- other than

8   speaking about the release conditions, none of this is true;

9   that I check in every time the app goes off and tells me to

10  check in.  I always check in.  And that was more of my reason

11  why I said that I wasn't feeling safe interacting with the

12  pretrial worker, because a lot of these accusations are not

13  true.  I check in every time the phone --

14           THE COURT:  Do you have proof that you checked in?  I

15  mean, you've been referring to your phone.

16           THE DEFENDANT:  The app.

17           THE COURT:  I just want to know because I'm going to

18  turn to pretrial and the government at one point and ask them

19  how did they keep track of when you didn't check in.  So I just

20  want to make sure if you have anything else you want me to

21  consider.

22           THE DEFENDANT:  It's not -- I just have the text

23  messages, but the app is not set up in a way where it's not

24  presented as biased.  I don't know who this communication

25  center is that Ms. Messett speaks about and where you would get

1  information --

2      THE COURT:  It doesn't -- but you do have texts that

3  confirm Ms. Messett would reach out to you and say check in.

4  You just said that, right?

5      THE DEFENDANT:  After August the 3rd, I haven't

6  talked to them anymore.  So --

7      THE COURT:  So you're saying you did not receive any

8  text from pretrial, from Ms. Messett, saying you need to check

9  in on the 6th, for example?

10     THE DEFENDANT:  I have -- no, ma'am.  I have not

11 talked to Ms. Messett after August the 3rd, which is the date

12 that they contacted me, and both Carrie -- Carrie sent me a

13 text message, actually.  Carrie didn't call me over the phone.

14 She wished me well.  And the pretrial worker is the one that

15 called me.  So I'm not aware of any -- from August the 6th, it

16 even mentions about me being in a location, saying that --

17     THE COURT:  And you didn't get a text on August 9,

18 2021, from Ms. Messett after she tried to call you and it went

19 to voicemail?

20     THE DEFENDANT:  Ma'am, if you read the report, it's

21 saying that Ms. Messett called me at 12 --

22     THE COURT:  I'm asking you.

23     THE DEFENDANT:  No, ma'am.  No.

24     THE COURT:  Okay.

25   All right, I'm going to turn to the government now and

1 give the government an opportunity to be heard.  Ms. Nazmy?

2          MS. NAZMY:  Thank you, Your Honor.

3      Would you like -- would you like us to stand or sit

4 while --

5          THE COURT:  You can sit.  That's fine.

6          MS. NAZMY:  Thank you.

7      We're going to proceed by proffer, Your Honor, but if the

8 Court prefers it, we can call Mr. Finneyfrock as a witness.

9          THE COURT:  You know, it may just be easier.

10 Mr. Finneyfrock, if you've got Cron for pretrial in front of

11 you, and you can walk through the information, because I am

12 going to -- I just want to know what the underlying evidence

13 is, especially supporting the August 9 violation with respect

14 to the communications.

15      We've got Ms. Johnson vigorously contesting that

16 Ms. Messett had any contact with her.  So it may be easier to

17 do it that way, and that way the record is clear.

18      And then since Mr. Finneyfrock will be direct-examined by

19 the government, either you, Ms. Johnson, or your standby

20 counsel, will have an opportunity to ask questions as well.

21 Okay?

22          THE DEFENDANT:  Okay.

23          THE COURT:  All right.

24          THE COURTROOM DEPUTY:  Mr. Finneyfrock, please raise

25 your right hand.

1      (The witness complied.)

2           THE COURTROOM DEPUTY:  You do solemnly swear or

3  affirm under the penalties of perjury that the information you

4  are about to give to the Court in the matter now pending before

5  it shall be the truth, the whole truth, and nothing but the

6  truth?

7           THE WITNESS:  I do.

8      (Witness sworn.)

9           THE COURTROOM DEPUTY:  Please state your name for the

10  record and spell each name.

11           THE WITNESS:  Erik Finneyfrock, spelled E-r-i-k; last

12  name, F-i-n-n-e-y-f-r-o-c-k.

13           THE COURTROOM DEPUTY:  And if you would please move

14  the microphone a little bit closer.  If you're going to remain

15  masked, we need to get a clear record.

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.

18                     DIRECT EXAMINATION

19  BY MS. NAZMY:

20  Q.   Good afternoon.

21  A.   Good afternoon.

22  Q.   Mr. Finneyfrock, did Ms. Messett document any problems

23  that she had supervising Ms. Johnson?

24  A.   Yes.

25  Q.   Can you please describe those problems?

1  A.   Just for clarification, Your Honor, you would like to

2  focus on the dates after the August 2nd hearing?

3          THE COURT:  I would.  I don't think that there is any

4  great dispute that Judge Di Girolamo had a hearing.  The

5  hearing dealt with the historic violations.  If Ms. Johnson or

6  Mr. Link wants to ask about those, they can, but in my view,

7  those violations were addressed with Ms. Johnson, and she was

8  told no more violations.

9          THE WITNESS:  Okay.

10         THE COURT:  And the allegation, as I understand it,

11  is that after that time, there wasn't any real communication

12  with Ms. Messett, but there is an August 9 violation report.

13         THE WITNESS:  Yes.

14         THE COURT:  So I think the most relevant time period

15  is after that.  Ms. Messett -- Ms. Nazmy, maybe we can start

16  there, and then you can follow up with any other questions you

17  wish to address.  Okay?

18  BY MS. NAZMY:

19  Q.   Following the revocation hearing that occurred on

20  August 2, 2021, did Ms. Messett document any problems she had

21  supervising Ms. Johnson?  And can you detail those problems?

22  A.   Sure.  Yes.  I apologize.  I'm just scrolling through.

23  There's a lot of GPS-related notes in here.

24         THE COURT:  And so the record is clear,

25  Mr. Finneyfrock, what you're looking at is a Cron file that

1   pretrial keeps?

2           THE WITNESS:  Yes.

3           THE COURT:  And the Cron file is the chronology of

4   the interaction between the supervising officer and the

5   supervisee.  Am I right?

6           THE WITNESS:  Correct, Your Honor.

7           THE COURT:  And that's used for this very purpose

8   because sometimes the people who did do the supervising is not

9   available for court, and so it's a regular practice.

10          THE WITNESS:  It is.

11          THE COURT:  Okay.

12          THE WITNESS:  So on August the 6th, Dr. Cohen -- I

13  believe this is an individual who was involved with the

14  defendant's mental health treatment -- said he attempted to

15  schedule her assessment.

16          THE DEFENDANT:  Objection.

17          THE COURT:  Basis?

18          THE DEFENDANT:  I mean, it sounds like he's saying

19  hearsay.  He said --

20          THE COURT:  No, that's okay.  In these hearings,

21  hearsay is permitted.  What Mr. Finneyfrock is doing is, even

22  though he wasn't the person with personal knowledge, he's

23  telling me what the officers put down in what's called a Cron,

24  and I'm allowed to hear that.

25      So any time -- and you correct me if I'm wrong,

1   Mr. Finneyfrock, but any time an officer supervising someone

2   has interaction with anybody concerning the conditions of

3   release, they document it in what's called a Cron. So that's

4   what Mr. Finneyfrock is testifying from. Okay? And I'm going

5   to allow it.

6       Go ahead.

7       THE WITNESS: So she was -- or Dr. Cohen attempted to

8   schedule her assessment. She told him that she was unavailable

9   that week; however, they did schedule for August 11th.

10       THE COURT: Okay.

11       THE WITNESS: There is another Crono, I believe, on

12   that same day, August 11th -- actually, it was August 19th was

13   this Crono. This was an email from Robert Cohen stating that

14   he texted Ms. Johnson the afternoon of 8-10-2021, as a reminder

15   of her mental health assessment scheduled for 11 a.m. on the

16   following day, which would have been August 11th. When I did

17   speak with her on August 11th, she initially informed me that

18   she forgot about the appointment. She then advised that she

19   was not willing to participate in the assessment until she had

20   spoken with the judge concerning the rationale for the mental

21   health assessment.

22       THE COURT: Okay.

23       THE WITNESS: Although, Dr. Cohen advised her that it

24   would be in her best interest to participate, she declined to

25   participate.

1    THE COURT:  Okay.

2    THE DEFENDANT:  I don't mean any offense, Your Honor,

3  but I'm just objecting simply because you asked if

4  Ms. Messett --

5    THE COURT:  Okay.  Hold on.  You have a continuing

6  objection to this entire line of testimony.  That means you do

7  not have to object again, and your objection is preserved for

8  the record.

9    I want to hear the Cron.  And if you believe that I have

10  made an error of law, you can appeal it.  Okay?  But be clear,

11  your objection is continuing.  You object to this entire line

12  of direct.  That's fine.  But I do want to hear it

13  uninterrupted.  Okay?

14    All right, go ahead.

15    THE WITNESS:  And that's limited to pretty much the

16  interactions of Ms. Messett of what she entered.

17    Now, I would like to note there are several biometric

18  check-ins that are in our Cronos that are automatically sent

19  over from the BI system.

20    THE COURT:  And for the same time period?

21    THE WITNESS:  Yes, for that same time period.

22    THE COURT:  All right.  So go ahead.

23    THE WITNESS:  Unfortunately, I'm trying to read

24  through them.  I'm not a location monitoring specialist, so

25  it's hard for me to interpret these.  I tried to jump on BI.com

1   to see if I could better interpret them and, however, I'm not

2   able to do so.  My access is limited right now so.

3            THE COURT:  Do you mean that your Internet access is

4   limited.

5            THE WITNESS:  No.  I tried to log in and it's not

6   working.  I haven't been on there for a while.

7            THE COURT:  Well, who could verify -- or maybe -- I'm

8   not sure exactly how you want to do this, Government, but all I

9   need is to understand the basis for the missed monitoring.

10      And maybe, Mr. Finneyfrock, you can discuss how these

11  violation reports are generated in terms of the reliability of

12  the information.  However you want to do it, I just need to

13  understand what I'm looking at in the violation report on

14  August 9th.

15           THE WITNESS:  I can speak a little bit to the Smart

16  Link technology.  This is just an application that is

17  downloaded on a defendant's cell phone.

18           THE COURT:  Okay.

19           THE WITNESS:  They receive text messages and alerts.

20           THE COURT:  Okay.

21           THE WITNESS:  And through that technology, they are

22  able to locate exactly where they are when they check in.

23           THE COURT:  So you're saying the Smart Link app would

24  send a text to a supervisee that it is time to check in?

25           THE WITNESS:  Yes.

1        THE COURT:  And when the supervisee checks in, then

2   the Smart Link app can record their location, provided that the

3   phone has a Geolocation device on it?

4        THE WITNESS:  From my understanding, yes.  And this

5   defendant was on some type of home confinement.  So it would be

6   able to tell -- we're able to set parameters.  We're able to

7   set exactly where she needs to be.  So we're able to be alerted

8   if she's outside that location.

9        THE COURT:  So the purpose of the Smart Link in this

10  case was not to principally track her every move, such as would

11  be indicated in the release of conditions that we talked about

12  at ECF 13.  It's a manner in which to monitor that she is at

13  the residence she was supposed to be 24/7?

14       THE WITNESS:  I believe so, Your Honor, yes.

15       THE COURT:  And this was used during the pandemic?

16       THE WITNESS:  It was.

17       THE COURT:  Okay.  So what am I looking at then in

18  the violation report on August 9th?  There are several -- under

19  apparent violations, there are several entries for alleged

20  missed meetings, missed check-ins, or delayed check-ins.  Can

21  you testify to the process that pretrial was using at this

22  point and what the significance of these entries are?

23       THE WITNESS:  So when she does check in, I believe

24  that would give us the ability to show exactly where she is at

25  that particular time.  That's why there are scheduled

1 check-ins.

2 　　　　THE COURT: Okay.

3 　　　　THE WITNESS: If she doesn't, we're not able to

4 obtain that information. So a late check-in would allow her to

5 either possibly return to where she needs to be, just as an

6 example. So that's why that is significant.

7 　　　　THE COURT: So there are, is it fair to say, there

8 are at least two instances in which Ms. Johnson, according to

9 this report, did check in, but the location service used by

10 Smart Link identified her as being not in the residence. One

11 was Frederick Road, Germantown; and the other is New York

12 Avenue, according to this report. Is that right?

13 　　　　THE WITNESS: Yes, Your Honor.

14 　　　　THE COURT: So that's what you mean about once a

15 person checks in, Smart Link can identify where they are?

16 　　　　THE WITNESS: Yes, Your Honor.

17 　　　　THE COURT: Okay, got it.

18 　　　And so with respect to the August 6, 7, 8, and 9

19 indications, there would be, if I understand it right -- Smart

20 Link would have sent, for example, August 6th, Smart Link would

21 have sent a check-in notice at 3:22, and the software would

22 communicate to your office that that was missed, but

23 Ms. Johnson would have used the app to check in later at 5:51.

24 Is that right? I'm sorry, missed both 3:22 and 5:51 but

25 checked in at 6:21?

1        THE WITNESS:  Yes, Your Honor.

2        THE COURT:  And it's your experience that the

3  software kept track of all of these requests to check in,

4  timely check-ins, late check-ins, no check-ins?

5        THE WITNESS:  Yes, Your Honor.

6        THE COURT:  Okay.  All right, that's helpful for me.

7    Ms. Nazmy, go ahead.  Follow up with whatever questions

8  you have.

9  BY MS. NAZMY:

10  Q.    After all this activity that was detailed on the notice of

11  apparent violation, did Messett know where the defendant was?

12  A.    No.

13  Q.    And what did she do to try to find her?

14  A.    She requested a warrant.

15  Q.    Did Ms. Messett ever indicate that she tried to visit the

16  defendant at her apartment?

17  A.    I apologize.  My computer just froze.  Court's indulgence,

18  please.

19    (Brief pause.)

20        THE WITNESS:  I have not indicated a Crono that

21  states that she attempted a home visit.

22        THE COURT:  You mean after August -- this August 2nd

23  bail review hearing?

24        THE WITNESS:  Correct.  I do not see a Crono

25  mentioning a home visit.

1        MS. NAZMY:  No further questions, Your Honor.

2        THE COURT:  Okay.

3    Ms. Johnson or Mr. Link, do you have any questions for

4    Mr. Finneyfrock?

5        THE DEFENDANT:  I have questions and I think, you

6    know, I might need help.  I've never done something like this.

7        THE COURT:  That's okay.  That's why Mr. Link is

8    there.

9        THE DEFENDANT:  Right.  And I feel like he may have

10   some questions too.

11       THE COURT:  Would you like Mr. Link to ask the

12   questions since he's a lawyer?  He kind of knows how to phrase

13   it, and then you can help him with the subject areas?

14       THE DEFENDANT:  Yes.  And if I have other questions,

15   will they be added?

16       THE COURT:  Sure.

17       THE DEFENDANT:  Okay.

18       THE COURT:  Let's get this record as complete as

19   possible.

20       THE DEFENDANT:  Yes, ma'am.

21       THE COURT:  So go ahead, Mr. Link.

22                    CROSS-EXAMINATION

23   BY MR. LINK:

24   Q.   Good afternoon, sir.

25   A.   Good afternoon.

1   Q.    So first of all, the report of August 9, 2021, you didn't

2   complete that, correct?

3   A.    I did not.

4   Q.    And everything you basically told the Court today, you

5   have no personal knowledge of, correct?

6   A.    Correct.

7   Q.    All right.  And it's correct, with respect to the

8   biometric system, you're not able to read the technical data on

9   the screen; is that correct?

10  A.    I can't access the BI website to look at the violation in

11  detail, correct.

12  Q.    Okay.  You agree that the report that Ms. Crenshaw

13  prepared does reflect that Ms. Johnson was in touch with

14  pretrial, correct?

15            THE COURT:  I'm sorry.  I can't hear you, Mr. Link.

16            MR. LINK:  Sorry.

17            THE COURT:  Right into the microphone.  Thank you.

18  BY MR. LINK:

19  Q.    So you agree that Ms. Johnson was in touch with pretrial,

20  correct?

21  A.    Was in touch with pretrial?

22  Q.    Correct.

23  A.    Through biometric check-ins, yes.

24  Q.    Okay.

25        Do you have anything to indicate point-blank that

1    Ms. Crenshaw asked Ms. Johnson what her current address was?

2    A.   Ms. Messett?

3    Q.   Ms. Crenshaw. I'm sorry.

4         THE COURT: Well, Mr. Crenshaw is the supervisor who

5    signs it. Ms. Messett is the --

6         MR. LINK: Thank you.

7         THE WITNESS: No, I don't have any evidence of that.

8    BY MR. LINK:

9    Q.   Okay.

10        And in addition to being able to speak to Ms. Johnson, the

11    pretrial officer was able to communicate with Ms. Bostick, who

12    was the third-party custodian, correct?

13    A.   Correct.

14    Q.   All right.

15        As far as the times that Ms. Johnson was, for example, at

16    2231 New York Avenue on August 6, 2021, do you have any

17    information as far as whether Ms. Johnson communicated that she

18    needed to be away from the home on that date?

19    A.   I don't have any information on that, no.

20    Q.   And do you have any information as far as whether

21    Ms. Johnson communicated, for example, she needed to go to a

22    doctor appointment on August 3rd, 2021?

23    A.   Let me check our files. No, I don't have any information

24    stating that she needed to attend a doctor appointment on that

25    date.

1  Q.   Do you have copies with you of any text that Ms. -- that

2  were sent to Ms. Johnson, allegedly sent to Ms. Johnson?

3  A.   Copies of texts?

4  Q.   Correct.

5  A.   No, I do not.

6  Q.   Do you have any emails that were allegedly sent to

7  Ms. Johnson in this case?

8  A.   I do not.

9  Q.   And you've never spoken to her yourself, correct?

10  A.   Ms. Johnson?

11  Q.   Correct.

12  A.   No.

13  Q.   All right.  As far as -- now, these various check-in

14  times, these various alleged violations, they refer to check-in

15  times, correct?

16  A.   Correct, Your Honor -- or, I'm sorry.  Yes.

17  Q.   All right.  There is no particular time.  It looks like

18  these are haphazard times?

19  A.   Yes.  It's a random check-in process.  So if we were able

20  to tell them exactly what time we were checking in, I think it

21  wouldn't be a very effective process.

22  Q.   And you agree that somebody has to have a working cell

23  phone in order to be available for this, correct?

24  A.   Correct.

25  Q.   And according to what you're seeing, did Ms. Messett or

1  anybody at pretrial make any effort to reach out to Ms. Johnson

2  after August 9, 2021?

3  A.    Not that I am aware, no.

4  Q.    Okay.

5  A.    Other than the filing of a warrant but --

6          THE COURT:  I'm sorry.  What was the last part?

7          THE WITNESS:  I mean, just the filing of the

8  warrant --

9          THE COURT:  Okay.

10         THE WITNESS:  But no -- not direct contact with

11  Ms. Johnson, no.

12  BY MR. LINK:

13  Q.    Okay.  Did anybody from pretrial send a message in any way

14  that they were filing a warrant -- did anybody communicate that

15  to Ms. Johnson from pretrial?

16  A.    I have no way of knowing that without -- I mean, other

17  than the Crono, but just looking at our notes, no.

18  Q.    Okay.

19         Sir, do you have any report that you could provide, a hard

20  copy of any report that you can provide from the biometric

21  servicer in connection with the report that you're looking at?

22  A.    No, not right now.  If given appropriate time, I may be

23  able to talk with our LMS specialist who could provide such a

24  report.

25         MR. LINK:  All right.  I have nothing else, Your

Honor.

THE COURT: Okay. Anything else before I turn to the government?

MS. NAZMY: Just two more questions.

THE COURT: Wait, wait. Hold on.

Ms. Johnson, anything else you wish for Mr. Link to ask or you wish to ask?

THE DEFENDANT: I guess if I were to ask a question, it's just sort of, kind of in relation to earlier you said on the record that you are not someone who is necessarily technical savvy or has specific detailed knowledge regarding biometrics. And so my questions were just to try to figure out the system itself.

THE COURT: Well, the system is that the pretrial office contracts with a third-party called Smart Link. Smart Link is in charge of running the biometric location service. Smart Link did that. The pretrial office is relying on their reports. And in my court, there is a presumption of accuracy.

So to the extent you want to challenge it down the road, have at it, but not now. They are presumed to be accurate.

Mr. Finneyfrock does not have to have all of that knowledge in his head. He's relying on them.

THE DEFENDANT: I understand.

THE COURT: Okay?

All right, Government.

REDIRECT EXAMINATION

BY MS. NAZMY:

Q.   You noted that the defendant did at some point check in.
Up until when was the defendant in touch with pretrial?

A.   Through biometric check-ins?

Q.   In any way whatsoever.

A.   It appears the last check-in occurred on August 14th.

Q.   After August 14th, was there any contact with the
defendant?

A.   No.

        MS. NAZMY:  No further questions.

        THE COURT:  All right.  Mr. Finneyfrock, you may step
down.  Thank you.

    (Witness excused.)

        THE COURT:  All right.  Ms. Nazmy, is there any other
evidence you want to put in?  Or is it going to go with what we
have and argue?

        MS. NAZMY:  Your Honor, we are relying on the
pretrial reports.

        THE COURT:  Okay.

        MS. NAZMY:  Thank you.

        THE COURT:  All right, go ahead.  What else do you
wish for me to know?  It's your turn so.

        MS. NAZMY:  Your Honor, we do refer to our written
submission, of course.

93

1    THE COURT:  Okay.  Yep.  I mean, if there is nothing
2    else, if there is nothing else you want me to know, that's
3    fine.  I just wanted to give you an opportunity to be heard on
4    this motion.
5         MS. NAZMY:  Certainly.  And I don't wish to be
6    repetitive, but, yes, we do wish to be heard.
7         THE COURT:  Okay.
8         MS. NAZMY:  So applying 18 U.S.C. 3148(b)(2)(B), it
9    is evident that Ms. Johnson is highly unlikely to abide by any
10   condition or combination of conditions.  The defendant incurred
11   numerous violations of release conditions, as detailed in the
12   three notices of apparent violation, and all occurred within
13   less than one month of supervision commencing.
14        And then, on August -- as of August 14, 2021, the
15   defendant absconded and was not seen again by her probation
16   officer.
17        The defendant has detailed efforts to communicate with the
18   court, such as her motion to quash, and visiting the Clerk's
19   Office, but during that time, she had her probation officer's
20   phone number.
21        THE COURT:  You mean pretrial?  Just so we're clear,
22   Pretrial Services?
23        MS. NAZMY:  Pretrial, yes.
24        THE COURT:  Okay.
25        MS. NAZMY:  Thank you, Your Honor.

94

1       THE COURT:  Yep.

2       MS. NAZMY:  Her pretrial officer's phone number and

3  could have contacted her at any time, and that, Your Honor, was

4  nine months ago.  The defendant was simply gone all that time.

5       And the defendant does have a history of failing to appear

6  in other proceedings in Washington, D.C.  She has not

7  established that there is an appropriate third-party custodian,

8  based on the interactions that the pretrial officer had with

9  the appointed third-party custodian.  And the defendant's

10  exhibit regarding Ms. Bostick is simply contrary to the U.S.

11  probation officer's report, and the details in the first notice

12  of apparent violation, which details Ms. Bostick's absolute

13  refusal to permit Officer Messett in her home for a

14  pre-scheduled home visit.  Probation needs to approve home

15  confinement location and third-party custodians.

16       Additionally, Ms. Johnson's demand that probation

17  communicate with her through her attorney was simply not

18  reasonable.  And, Your Honor, for the record, there has been

19  some discussion of Ms. Corcoran withdrawing when, in fact, it

20  was Ms. Johnson that fired her.

21       Ms. Johnson, obviously, felt inconvenienced by her

22  conditions of release and her dealings with her probation --

23  with her pretrial officer, but that does not excuse her conduct

24  or her repeated refusal to abide with instructions, as she was

25  required to do.

95

1      Judge Di Girolamo held a revocation hearing on August 2,

2   2021, and said no more violations, and the defendant violated

3   the very next day.  The third notice of apparent violation

4   details 11 instances of the defendant violating her release

5   conditions, and, as of the 14th, absconded completely.

6      With respect to the defendant's argument that the release

7   order doesn't provide for location monitoring because the box

8   isn't checked, pretrial has discretion to enforce the court's

9   order in the appropriate way.  And during COVID, pretrial

10  managed to supervise safely using cell phone technology and

11  biometrics, and this was for officer safety and for the

12  defendant's safety.

13     And the release order did state the defendant shall

14  promptly obey all reasonable directions and instructions of the

15  supervising officer.  The defendant failed to do so completely.

16     So under 18 U.S.C. 3148(b)(2)(B), this court shall enter

17  an order of revocation and detention if it finds that the

18  defendant is unlikely to abide by any condition or a

19  combination of conditions.

20     The government does believe that the standard provided

21  under 3148(b)(2)(A) is also satisfied here and would be happy

22  to argue with respect to that if Your Honor is not already

23  convinced.

24         THE COURT:  Well, I'm going to give Ms. Johnson an

25  opportunity to be heard on the law, but I have to tell you, I'm

96

1   squarely focused on "unlikely to abide by any condition or a

2   combination of conditions of release."  That's where I am.  So

3   to the extent Ms. Johnson persuades me otherwise, I may turn

4   back to you, and you can make your alternative argument, but if

5   not, it's likely moot.

6            MS. NAZMY:  Thank you, Your Honor.

7            THE COURT:  Okay.  Thank you.

8       Ms. Johnson.

9            THE DEFENDANT:  So there's some things that I wanted

10  to touch back on.  I know that we're not focusing on the

11  July the 26, 2021, pretrial report, but I just wanted to be

12  clear, because it's just kind of hurting to my heart to just

13  keep hearing that the third-party custodian was not willing to

14  allow the officer to conduct her home visit.

15      And I have my exhibits.  I don't know if at this point you

16  submit more exhibits, but there is a signature there on the

17  first page from the third-party custodian, which means that,

18  obviously, something took place on that day, and I'd like it to

19  be submitted into evidence.

20           THE COURT:  Which are we talking about?

21           THE DEFENDANT:  This is my pretrial report release

22  conditions.

23           THE COURT:  I have it.

24           THE DEFENDANT:  Ms. Messett needed to come to the

25  home.

1    THE COURT:  Yep, I've got it.

2    THE DEFENDANT:  She needed to come to the home to

3    conduct a home visit.  And something took place that day, and I

4    believe that it was a home visit.

5    THE COURT:  Mr. Link, are we talking about the same

6    document, ECF 13?  Or is this something different?

7    THE DEFENDANT:  It's the same thing.

8    MR. LINK:  I think it's the same thing.  The first

9    page --

10    THE COURT:  Where Ms. Bostick signed it?

11    MR. LINK:  Yes.

12    THE COURT:  Yeah, I've got it.

13    THE DEFENDANT:  There is a signature there, which

14    means that, obviously, Ms. Messett and the third-party

15    custodian -- Ms. Messett was obviously satisfied.  She received

16    a signature.  And, you know, I was present there, and I would

17    disagree with the fact that the third-party custodian was not

18    willing to allow her to basically do her job.  It's just simply

19    not true.

20    In the evidence that the prosecutor submitted before the

21    Court, it spoke about my driving record and how it said -- so I

22    would like to submit my driving record.  I have no points here

23    on my driving record.

24    THE COURT:  I'll accept your representation.

25    THE DEFENDANT:  Okay.  It was submitted into

1  evidence, you know, to say that I was a negative driver and --

2           THE COURT:  No, that's not what they are saying.

3  They are saying that in the pretrial report, you have prior

4  failures to appear.  That was the point.  And you have -- and

5  you do.  There hasn't been any evidence to the contrary.  So

6  that was the point of it.

7           THE DEFENDANT:  Well, I'm hoping that my testimony

8  can suffice that I am -- I have been present in hearings before

9  the district court, as well as the State of Maryland recently,

10  and I'm not aware of not having failed to appear or -- it's

11  never been brung up.  There has been a pretrial report that was

12  submitted to you.  I don't know if I need to submit it again.

13           THE COURT:  No, I have the report.

14           THE DEFENDANT:  But there is nothing that indicates

15  that I have failed to appear.  The most recent pretrial report

16  in other cases, you know, would show that I have adhered and

17  followed the rules of my Pretrial Services agent.  I have

18  communicated with her successfully.  I have checked in weekly.

19  I've pretty much followed all of my requirements.  So I'm not

20  really, sure other than a pretrial report where you're getting

21  evidence that would say that I have --

22           THE COURT:  This pretrial report in this case, the

23  one that was prepared by this Pretrial Services Office, which

24  is pages long, that details not only prior convictions you have

25  for very similar conduct, but also prior failures to appear.

1          THE DEFENDANT:  Are you speaking about the one from

2     May the 25th?  Because that was the most recent one.

3          THE COURT:  I'm speaking from the one that you had

4     when you first came to court, swore to Judge Di Girolamo you

5     would abide by conditions, and he released you on those

6     conditions, on very stringent conditions.  That one.  It is

7     numbers in 14 pages.  It's 14 pages long, and it has prior

8     convictions for you going back to age 21 in 2010, and peppered

9     within them are failures to appear.  That's what I'm talking

10    about.

11         So I take as evidence in your favor that there is a recent

12    pretrial report in D.C., where D.C. has decided to release you

13    on your own recognizance, and I accept your representation that

14    you're abiding by that.

15         THE DEFENDANT:  I have been.

16         THE COURT:  Okay, good.

17         THE DEFENDANT:  I'd also like you to factor into

18    consideration my most recent motion that I filed on April the

19    26th, which --

20         THE COURT:  In this court?

21         THE DEFENDANT:  Yes, ma'am.  I filed a motion to come

22    before this court requesting a hearing.

23         THE COURT:  Right.

24         THE DEFENDANT:  Because I was made aware of

25    information that I was not, obviously, properly had been made

1  aware of.

2       THE COURT:  I see that.  I do have it.  Yep.

3       THE DEFENDANT:  And so I think I should be focusing

4  on why I am aware of the fact that I can abide by conditions of

5  release.  So I would like to point out that I have an upcoming

6  hearing in D.C.  I have an entire trial, actually, prepared

7  before me.  I can't miss that.  It was --

8       THE COURT:  Well, then you're going to need to work

9  with Mr. Link to make sure that you are in touch with D.C. so

10 that D.C. knows where you are and what's going on.  But I hear

11 you.  You can't miss that.  But I'm focused right now on 18

12 U.S.C. 3148, and whether you have demonstrated you can

13 reasonably abide by conditions of release.

14      THE DEFENDANT:  I need to look at 3148 to attempt to

15 say something.

16      THE COURT:  I thought it was given to you.

17      THE DEFENDANT:  Not a printed out document, no.  Just

18 the computer screen.

19      MR. LINK:  I have it on my phone, Your Honor.  It's

20 on my phone, Your Honor, and we're sharing it.

21      THE COURT:  And I'm going to read it as well.  It

22 says, "Sanctions for violation of a release condition."  An

23 arrest warrant was issued for you for violating a condition of

24 your release.  3148 says, (A), that "You are subject to

25 revocation of release, an order of detention, or prosecution

1   for contempt in any court if I find that you violated a
2   condition of your release."  And it goes on.  3148(B) says,
3   "The judicial officer shall enter an order of revocation and
4   detention if after a hearing the judicial officer finds that
5   there is" -- and then it goes through one -- we're not looking
6   at that one -- "finds that the person is unlikely to abide by
7   any condition or combination of conditions of release."
8        If I find that there is -- is the standard preponderance
9   or clear and convincing?
10          MS. NAZMY:  Your Honor, we believe it's
11  preponderance.
12          THE COURT:  If I find that there is evidence -- and
13  I'll do it both ways, just so we're clear -- the person is
14  unlikely to abide by any condition or a combination of
15  conditions of release, then I shall detain you.
16       There's two burdens of proof, clear and convincing or
17  preponderance.  Cutting everything in your favor, I'll use
18  clear and convincing.  I'll use the higher.  And I'll tell you
19  right now the evidence to me is that you are not likely to
20  abide by conditions of release.  So it is on you.  I'm giving
21  you one last opportunity, because we've been going at this for
22  over two hours, to tell me what evidence there is other than
23  what's going on in D.C., and I credit that, and I credit that
24  you tried to get somebody to pay attention to your case;
25  however, I've got an unrebutted record of multiple violations

1  of pretrial.

2      I have no evidence that you have a current residence or

3  third-party custodian who is suitable.  I find Ms. Bostick is

4  not.  I'm not going to put pretrial through this he said, she

5  said again with Ms. Bostick.  So I've got nothing.

6      Judge Di Girolamo put you on the most stringent conditions

7  possible, and while you take exception to many of them,

8  that's -- once you're given the grace of this court to be on

9  release under very stringent conditions, you really don't have

10  a whole lot of liberty to question why or how.  You have to

11  show the judge you can comply.

12      Judge Di Girolamo gave you a second chance on August 2nd,

13  and I'm hearing nothing that suggests when the government said

14  Judge Di Girolamo was really clear, follow the conditions or I

15  will detain you, you didn't get that message because then

16  there's six and seven more days of not going to check in when

17  you're supposed to through Smart Link, checking in late,

18  checking in not at all, not going to your mental health

19  evaluation.

20      I mean, you can tell me all the reasons why you thought it

21  wasn't appropriate, but that -- when you're on pretrial release

22  and you say, I'm willing, in exchange for being released, I'm

23  willing to abide by those conditions, then you have to.

24      I find they are all reasonable.  There is not an

25  unreasonable condition that was placed on you.  That's my

1  finding.

2      So you can have one more opportunity to tell me why I'm

3  wrong, and then we're going to end this.

4          THE DEFENDANT:  Okay.  I don't know if you -- I don't

5  have a copy of the NCIC report, but I'm just looking here.  You

6  know, it speaks about not violating any federal or state or

7  local crimes while out on release.  Despite everything that

8  you've heard, I feel like it's been about ten months there, I

9  have no new arrests.  So I would like that to be submitted.  If

10  somebody could give me the NCIC report.

11          THE COURT:  And I accept your representation.  What

12  that means is I accept as a fact, as true, that you have no

13  other new charges for the last ten months.  I accept that as

14  true.

15          THE DEFENDANT:  I'm not sure -- this part is really

16  difficult, but I'm not sure if I need to make a recommendation

17  of something else.  It doesn't give a list of what the least

18  restrict -- conditions of release can be.

19          THE COURT:  Okay.  So let me explain.  You are on

20  about the most restrictive conditions that a person could be

21  on.  There is nothing else left other than 24-hour -- when

22  you're put on 24-hour lockdown, there is not much left.  And so

23  the original finding that Judge Di Girolamo made is there is

24  no -- there is only one set of conditions that could reasonably

25  assure your appearance and safety to the community, and those

104

1   are the ones he put you on.  You violated those.  There is
2   nothing left.  That's my view on it.
3       So I don't know what else you want to tell me you think I
4   should entertain.
5           THE DEFENDANT:  Electronic monitoring is there,
6   ma'am.  GPS monitoring is there.
7           THE COURT:  You couldn't do the Smart Link.  Why
8   would you comply with --
9           THE DEFENDANT:  It's a cell phone and I tried to
10  explain that.  I had the lowest -- due to my finances at the
11  time, I had the lowest --
12          THE COURT:  There is no evidence that your finances
13  stopped you from checking in, because you did check in, just
14  when you wanted to.  And you checked in late, and you checked
15  in from other locations.  So even if I just look at those two,
16  the 9th, that violation, twice you were not where you were
17  supposed to be, which is at Ms. Bostick's home.
18      So I reject that finances are the reason why you couldn't
19  comply.  Because when you did comply, it showed you were not
20  complying.  Do you understand?
21          THE DEFENDANT:  I understand what you're saying.
22          THE COURT:  Okay.  We're going to -- I've heard you,
23  Ms. Johnson.  You can take -- you can appeal my decision with
24  Mr. Link's help.  You can move to reconsider if you have new
25  evidence, but I'm prepared to rule.

270

105

1    This is before me on a de novo review from Judge Simms'
2   detention order where she found that pursuant to 18 U.S.C.
3   3148(B), that there was substantial evidence after a hearing
4   that Ms. Johnson's release should be revoked because there was
5   evidence she was unlikely to abide by any condition or a
6   combination of conditions of release.
7    Now, having reviewed not only the hearing from that day,
8   the evidence that was put before Judge Simms, but after a two
9   and a half hour hearing, several supplemental reports,
10  including the most recent from pretrial, Mr. Finneyfrock's
11  testimony, it is the finding of this Court that Judge Simms
12  did, indeed, get it right; that whether this is a preponderance
13  of the evidence standard or clear and convincing, there are, in
14  my view -- give me one second.
15   What the record evidence demonstrates is that Ms. Johnson
16  is unlikely to abide by any condition or a combination of
17  conditions of release.  Even if I were to confine this analysis
18  to after the August 2nd bail review hearing where, in the light
19  most favorable to Ms. Johnson, say Judge Di Girolamo had
20  adjudicated all of the prior violation reports, he also was
21  quite clear that from then forward, Ms. Johnson had to comply
22  with all conditions of release.
23   I find, as a matter of law, those conditions were
24  reasonable.  I am not convinced that any of them were
25  unreasonable, and that thereafter, for six days, according to

271

106

 1  the Pretrial Services memorandum dated August 9, there were

 2  several subsequent violations.

 3       In Ms. Johnson's defense, she states that the app used to

 4  monitor the 24-hour lockdown, was, A, not authorized under ECF

 5  13 because the box for GPS monitoring was not checked.  I

 6  disagree.  As a matter of law, just because that box wasn't

 7  checked does not limit pretrial in monitoring the 24-hour-a-day

 8  lockdown using Smart Link.  There is nothing in this report

 9  that says pretrial must read it as one to the exclusion of the

10  other.

11       And I do find that during the pandemic, that was really

12  one of the only safe ways to monitor 24-hour lockdown.  And so

13  that argument I reject.

14       Secondly, Ms. Johnson said that money was tight, and the

15  cell phone that you had wasn't going to -- it was going to

16  basically be an added expense for you to comply.  The record

17  evidence, which really has not been rebutted, suggests

18  otherwise.  You did check in, except just when you wanted to

19  check in, not when Smart Link told you to.

20       There's numerous examples, and I'm not going to cite each

21  and every one of them, but I do rely on the record at August --

22  of the missed and late check-ins at the violation -- in the

23  violation report for August 9, where you did check in, but you

24  checked in late or not at all.  And when you did check in, you

25  weren't where you were supposed to be.  So you knew how to

1  check in.  You could check in.  You just chose not to.

2      And there is no way that you could be reasonably

3  supervised if you won't agree to use the software that pretrial

4  uses.  You've given me no confidence that you would now if I

5  released you.  If pretrial says you've got to do it a certain

6  way, the record reflects that you would dispute it.  You would

7  say you can't, you won't.  And if you can't and you won't, that

8  means there are no reasonable conditions that can be set.

9      So that deals with I think the legal arguments that you

10  were making.  In your favor, and I do credit, you appear to be

11  complying in D.C., but the D.C. court doesn't bind this court,

12  and you had conditions of release, and you didn't follow them.

13      To your credit, you did reach out.  And if this were about

14  whether there were problems with this case due to the pandemic,

15  I would agree.  It was difficult for you to get an answer with

16  respect to a court date, for example, but that doesn't mean you

17  stop communicating with your pretrial officer.  Or it doesn't

18  excuse the reasonable least restrictive conditions that Judge

19  Di Girolamo imposed.

20      And on those, the August 19th memorandum and those facts

21  are untouched.  They are unrebutted.

22      Lastly, it is in the ordinary course of business that the

23  pretrial office has certain officers who are trained,

24  experienced, and educated as to how to supervise individuals

25  pursuant to our court order.  Sometimes those officers are not

108

1  available for court.  Equally, officers like Mr. Finneyfrock

2  are trained how to pick up what we call a Cron file or a

3  reflexion of what happened and report it to the Court.

4      So your objections with respect to hearsay or

5  unreliability of the evidence to which Mr. Finneyfrock

6  testified I do -- I reject those.  I do believe that the

7  evidence at the -- in the August 9, 2021, memorandum is

8  reliable.  It is trustworthy and I credit it.

9      So what this means is that I -- you know, whether I affirm

10 it or re-enter an order, however you wish for me to do it, I'll

11 do it both on the record, there is no error in what Judge Simms

12 did.  Her order of detention stands, and my understanding is

13 you're going to be back in front of her for not only an

14 election hearing in this case, but part of this process

15 uncovered that you had another case that evidently has not been

16 resolved because of a failure to appear; and it's my

17 understanding from Judge Simms that she will be handling that

18 as well.

19     Let me ask Mr. Link, Ms. Johnson, and Ms. Nazmy.  You have

20 another court date in front of Judge Simms?

21         MR. LINK:  The 21st is a status, Your Honor -- or the

22 22nd.

23         MS. NAZMY:  I believe it's the 22nd at 9 a.m.

24         THE COURT:  Okay.  So let's be super clear.

25 June 22nd at 9 a.m.  It is an in-person status; is that right?

1          MR. LINK:  Correct.

2          MS. NAZMY:  That's correct.

3          MR. LINK:  We took it down and I think she entered an

4   order --

5          THE COURTROOM DEPUTY:  Mr. Link, we can't --

6          THE COURT:  You have to sit because we can't hear

7   you.

8          MR. LINK:  I'm sorry.  I'm used to pre-pandemic.

9          THE COURT:  That's all right.

10          MR. LINK:  The answer is "yes" to your question.

11          THE COURT:  Okay.  All right, and so the government

12  will do the come up.  There is no -- there's not going to be

13  any confusion, Ms. Johnson.  Your next court appearance is

14  June 22nd, in front of Judge Simms, and there will be a come

15  up.  All right?

16       Mr. Link?  Ms. Nazmy?

17          MR. LINK:  Yes, that is correct.

18          THE COURT:  Okay.

19          MS. NAZMY:  Yes, Your Honor.

20          THE COURT:  All right.  Is there anything else the

21  government needs from me?

22          MS. NAZMY:  Nothing from the government.  Thank you.

23          THE COURT:  Okay.

24          THE DEFENDANT:  We're supposed to go back before

25  Judge Simms to address today.  They said we were supposed to go

1   back before her.

2           THE COURT:  Oh, for the other failure to appear?

3           MR. LINK:  Yes.

4           THE DEFENDANT:  It's for another case.

5           THE COURT:  Okay.  All right, well, then we'll let

6   Judge Simms know that we're done.  So you can go back before

7   her on the other case.

8           THE DEFENDANT:  Okay.  Before we --

9           MS. NAZMY:  I do believe that there was a 2:15

10  initial appearance with another defendant.  So I do believe

11  that Judge Simms is occupied at the moment.

12          THE COURT:  Okay.  But then you all can slide in

13  after that.

14          MS. NAZMY:  Yes.

15          THE COURT:  Great.  Just stay in touch with her

16  chambers.

17      What else do you need?

18          THE DEFENDANT:  I just wanted to get clarity.  So my

19  motion for review of the May 6th order is denied?

20          THE COURT:  That's right.  ECF is denied and I'll

21  issue that.

22          THE DEFENDANT:  And the motion for reconsideration of

23  my detention has been denied as well?

24          THE COURT:  Correct.

25          THE DEFENDANT:  Okay.

1          THE COURT:  Yes.

2          THE DEFENDANT:  Thank you.

3          THE COURT:  And, Ms. Johnson, what we're going to do,

4    because you are currently in a pro se status, is I'm going to

5    enter a paperless order denying your motion.  Ms. Derro is

6    going to print out the docket for you and give you a copy of it

7    so you have a record of what happened today.  Okay?

8          THE DEFENDANT:  Okay.

9          THE COURT:  We'll make sure you get that.

10          THE DEFENDANT:  Are we still on the record?  Do I

11    have -- do I have an opportunity to ask for another oral motion

12    for reconsideration of my detention?  I'm going to lose my

13    house, my home.

14          THE COURT:  Okay.  You can talk with Mr. Link about

15    it and have -- you know, about what the law requires in terms

16    of reconsideration.

17          THE DEFENDANT:  Okay.

18          THE COURT:  Okay?  And you can also talk with him

19    about whether you wish to continue representing yourself, if

20    you want his help in this matter, but I can't give you legal

21    advice.  So I would encourage you to talk to Mr. Link about it.

22    Okay?

23          THE DEFENDANT:  Okay.

24          THE COURT:  All right.  Thank you.  We're adjourned.

25          MS. NAZMY:  Thank you.

1          THE COURTROOM DEPUTY:   This Honorable Court stands

2    adjourned.

3          (The proceedings were adjourned at 2:18 P.M.)

4

5          I, Marlene Kerr, FCRR, RPR, CRR, RMR, certify that the

6    foregoing is a correct transcript of the stenographic record of

7    proceedings in the above-entitled matter.

8

9                        Dated this 5th day of July, 2022

10

11                              _____/s/_____
                                Marlene Kerr
12                         Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25